**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**COALITION OF ARIZONA/NEW MEXICO
COUNTIES FOR STABLE ECONOMIC
GROWTH**, a non-profit organization, et al.,

Plaintiffs,

vs.                                                              No. **CIV 03-508 MCA/LCS**

**UNITED STATES FISH AND
WILDLIFE SERVICE**, et al.,

Defendants,

and

**DEFENDERS OF WILDLIFE**, et al.,

Defendant-Intervenors.

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on ***Plaintiffs' Motion for Preliminary Injunction***

[Doc. No. 26] filed on October 7, 2004, ***Plaintiffs' Motion to Expedite Consideration of***

***Plaintiffs' Motion for Preliminary Injunction*** [Doc. No. 78] filed on May 12, 2004, and

***Plaintiffs' Motion to File Surreply in Response to Defendants' Notice of Filing***

***Supplemental Authority*** [Doc. No. 89] filed on July 2, 2004.  After issuing several stipulated

orders [Doc. No. 34, 37, 76] which extended the briefing schedule on Plaintiff's motion for

preliminary injunction and allowed for supplementation of the Administrative Record per the

parties' stipulation, the Court held a hearing on Plaintiff's motion in Albuquerque, New

Mexico, on June 29, 2004.  Having considered the Administrative Record [Doc. No. 39, 46,

77], the applicable law, the written submissions and oral arguments of counsel, including Plaintiffs' surreply [Doc. No. 90], and being fully advised in the premises, I conclude that preliminary injunctive relief is not warranted based on the findings of fact and conclusions of law set forth below. Therefore, *Plaintiffs' Motion for Preliminary Injunction* [Doc. No. 26] is denied, *Plaintiffs' Motion to File Surreply in Response to Defendants' Notice of Filing Supplemental Authority* [Doc. No. 89] is granted, and *Plaintiff's Motion to Expedite Consideration of Plaintiff's Motion for Preliminary Injunction* [Doc. No. 78] is denied as moot.

## I.   **FINDINGS OF FACT**

1.      Plaintiffs in this action are a group of nine non-profit organizations which represent the interests of some members of the livestock industry and some rural economies of Arizona and New Mexico. The lead Plaintiff, Coalition of Arizona/New Mexico Counties for Stable Economic Growth ("the Coalition"), is comprised of local governments, other agriculture and industry organizations, private individuals, and businesses located in these two states who have met the Coalition's application and membership-dues requirements. The membership of the other Plaintiff organizations is comprised primarily, if not exclusively, of private individuals who reside, farm, ranch, hunt, fish, guide, recreate, own property, or hold licenses or permits in areas of Arizona and New Mexico affected by Defendants' reintroduction program for the endangered Mexican gray wolf. Plaintiffs Grant County Farm and Livestock Bureau and Mimbres Farm and Livestock Bureau are affiliates of Plaintiff New Mexico Farm and Livestock Bureau.

2.     Defendant United States Fish and Wildlife Service is a federal agency within the United States Department of the Interior.  Defendants Gale Norton, Steve Williams, H. Dale Hall, David Yazzie, Wendy Brown, and Bruce Palmer are officials or employees of Defendant USFWS and/or the United States Department of the Interior.  Defendant USFWS and the individual Defendants are charged with administering the Endangered Species Act (ESA), including the Mexican gray wolf reintroduction program.[1]

3.     The Mexican gray wolf is a separate and distinct subspecies of gray wolf that historically inhabited areas in New Mexico, Arizona, Texas, and northern Mexico.  Prior to efforts by Defendants to reintroduce the Mexican gray wolf, this subspecies was considered extirpated from its historic range in the southwestern United States because no sightings of wolves in the wild had been confirmed since 1970.  See Final Rule:  Establishment of a Nonessential Experimental Population of the Mexican Gray Wolf in Arizona and New Mexico, 63 Fed. Reg. 1,752, 1,752 (Jan. 12, 1998) (to be codified at 50 C.F.R. § 17.84(k)) (hereinafter "Final Rule").

4.     The Mexican gray wolf was listed as an endangered subspecies pursuant to the ESA on April 28, 1976. See 41 Fed. Reg. 17,742 (codified at 50 C.F.R. § 17.11 (2003)).  The entire gray wolf species in North America south of Canada was listed as endangered on

---

[1]In addition to the federal Defendants named above, two non-profit environmental organizations, Defenders of Wildlife and the Center for Biological Diversity, have intervened as Defendants in this case.  These organizations are referenced in this *Memorandum Opinion and Order* as "Defendant-Intervenors" while the federal Defendants (not including the intervenors) are referenced as "Defendants."

March 9, 1978.  See 43 Fed. Reg. 9,607 (codified at 50 C.F.R. § 17.11).

5.      In 1982, Defendant USFWS issue a recovery plan for the Mexican gray wolf. The objective of the recovery plan is to conserve and ensure survival of the subspecies by maintaining a captive breeding program and re-establishing a viable, self-sustaining population of at least 100 Mexican wolves in a 5,000 square mile area within the subspecies historic range.  [EIS AR 46, at 23.]

6.      On April 20, 1992, Defendant USFWS issued a "Notice of Intent to Prepare an Environmental Impact Statement on the Experimental Reintroduction of Mexican Wolves (Canis lupis baileyi) into Suitable Habitat within the Historic Range of the Subspecies."  See 57 Fed. Reg. 14,427.  The Draft Environmental Impact Statement concerning this subject was released for public review and comment on June 27, 1995.  See 60 Fed. Reg. 33,224.

7.      On May 31, 1995, Defendant USFWS completed an intra-agency consultation regarding the reintroduction of the Mexican gray wolf pursuant to Section 7 of the ESA.  16 U.S.C. § 1536.  The result of the consultation was that the Arizona and New Mexico Ecological Services State Offices of the USFWS concurred in the Mexican Wolf Recovery Coordinator's finding that the proposed action "may affect, [but is] not likely to adversely affect" the Mexican gray wolf.  [AR 993.]

8.      On May 1, 1996, Defendant USFWS published a proposed rule regarding reintroduction of the Mexican gray wolf in the Federal Register.  See Proposed Establishment of a Nonessential Experimental Population of the Mexican Gray Wolf in Arizona and New Mexico, 61 Fed. Reg. 19,237 (May 1, 1996).

9.      On December 23, 1996, Defendant USFWS published a notice in the Federal Register regarding the availability of the Final Environmental Impact Statement (FEIS) for the proposed reintroduction of the Mexican gray wolf within its historic range in the southwestern United States.  See 61 Fed. Reg. 67,573 (Dec. 23, 1996).

10.      On April 3, 1997, Defendant USFWS published a notice in the Federal Register regarding the availability of the Record of Decision and Statement of Findings regarding the FEIS noted above.  See 62 Fed. Reg. 15,915 (Apr. 3, 1997).

11.      The Preferred Alternative identified in the FEIS calls for the reintroduction of a population of Mexican gray wolves designated as "experimental" and "nonessential" pursuant to Section 10(j) of the ESA.  16 U.S.C. § 1539(j).  This designation provides Defendants with greater management flexibility with regard to their reintroduction efforts because an "experimental, nonessential" population is not afforded the full level of protection otherwise afforded to an endangered species under the ESA.  See Final Rule, 63 Fed. Reg. at 1,752. Among other things, the experimental, nonessential designation allows Defendants (and, in appropriate circumstances, private citizens) to respond to conflicts between wolves and human activities by harassing, removing, translocating, or even killing the reintroduced wolves.  See id.

12.      The FEIS identifies two potential areas for reintroduction of the experimental, nonessential population of Mexican gray wolves:  the Blue Range Wolf Recovery Area (BRWRA or "wolf recovery area") located in southwestern New Mexico and southeastern Arizona, and the White Sands Wolf Recovery Area (WSWRA) located in south central New

Mexico.  [EIS-AR 25, at Fig. 1.]  Only the BRWRA is currently used for this purpose.

13.     The BRWRA is divided into a "Primary Recovery Zone," which consists of a smaller, distinct portion of the BRWRA located in Arizona along that state's border with New Mexico, and a "Secondary Recovery Zone," which consists of the larger, remaining portion of the BRWRA, including the Gila Wilderness in the Gila National Forest in New Mexico.  [EIS-AR 25, at Box 1.]

14.     The Preferred Alternative also calls for a larger "Mexican Wolf Experimental Population Area" surrounding the BRWRA and encompassing most of the southern halves of the states of Arizona and New Mexico.  The purpose of designating this larger area is to establish that any member of the reintroduced Mexican wolf population found in this area is still a member of the nonessential experimental population and is subject to the special rules that apply to this population, including provisions for capture and return to the designated recovery areas.  [EIS-AR 25, at Box 1; Final Rule, 63 Fed. Reg. at 1,753-54.]

15.     Under the "Preferred Alternative" identified in the FEIS, Mexican gray wolves initially were to be released into the Primary Recovery Zone and then allowed to disperse naturally into the Secondary Recovery Zone.  [EIS-AR 25, at v.]

16.     However, the FEIS analyzes environmental impacts of the presence of wolves in the region as a whole, including both the Primary Recovery Zone, the Secondary Recovery Zone, and the surrounding areas outside the BRWRA into which wolves might naturally disperse.

17.     The FEIS extensively discusses the issue of wolf predation with respect to

livestock and other animals.  Based on an anticipated population of 100 wolves in the

BRWRA, the FEIS estimates that:  "Wolves likely will take between one and 34 cattle per

year, representing less than one-twentieth of one percent of all the cattle present.  This

should not cause a major impact to ranching as a whole in the area, but some ranchers may

experience significant losses."  [EIS-AR 25, at 4-9.]  The FEIS emphasizes that:  "These

projections are best estimates; rates could be different."  [EIS-AR 25, at 4-4.]  In addition,

the FEIS acknowledges that:  "Some cattle likely will be killed but not detected . . . ."  [FEIS-

AR 25, at 4-4.]

18.    Appendix A to the FEIS addresses the issue of hybridization between wolves

and dogs as follows:

> Mexican wolves could potentially interbreed with domestic or feral
> dogs or coyotes.  Past interbreeding between wild northern gray wolves and
> coyotes has been documented in Minnesota, Ontario, and Quebec.
> Nevertheless, obvious hybrid phenotypic forms (that is canids that appear
> intermediate between wolves and coyotes) are not found in the wild, except
> possibly in southeastern Ontario.
>
> There are no records of Mexican wolves interbreeding with coyotes
> and, while the future potential exists, the likelihood is not considered great.
> This potential will be further minimized by:  (1) releasing mated pairs, (2)
> closely monitoring and studying released wolves and their offspring, (3)
> capturing and relocating wolves that disperse out of wolf recovery areas, and
> (4) re-establishing wolf populations in numbers sufficient that potential wolf
> mates are available for dispersing wolves.

[EIS-AR 25, at A-5 to A-6 (citations omitted).]

19.    On January 12, 1998, Defendant USFWS published the Final Rule in the

Federal Register.  See Final Rule, 63 Fed. Reg. 1,752.

20.     The Final Rule and Record of Decision allow for the immediate implementation of the Preferred Alternative identified in the FEIS, which is to reintroduce a nonessential, experimental population of Mexican gray wolves into the primary recovery zone of the BRWRA.

21.     The Final Rule contains a finding that "the release of the experimental population will further the conservation of the subspecies and of the gray wolf species as a whole." 63 Fed. Reg. at 1,755.  In support of this finding, the agency reasons that immediate implementation of the reintroduction program will benefit the subspecies because

> [t]his reintroduction will establish a wild population of at least 100 Mexican wolves and reduce the potential negative effects of keeping them in captivity in perpetuity.  If captive Mexican wolves are not reintroduced to the wild within a reasonable period of time, genetic, physical, or behavioral changes resulting from prolonged captivity could diminish their prospects for recovery.

Id.  The agency also reasons that

> even if the entire experimental population died, this would not appreciably reduce the prospects for future survival of the subspecies in the wild.  That is, the captive population could produce more surplus wolves and future reintroductions still would be feasible if the reasons for the initial failure are understood.  The individual Mexican wolves selected for release will be as genetically redundant with other members of the captive population as possible, thus minimizing any adverse effects on the genetic integrity of the remaining captive population.

Id. at 1,754.

22.     In response to public comments, the Final Rule was modified from the Preferred Alternative (previously discussed in the FEIS) in certain respects.  In particular, the Final Rule modifies the definition of the "Secondary Recovery Zone" in order "to clarify

that, following the initial release of wolves in the primary recovery zone, wolves may be translocated and released in the secondary recovery zone for authorized management purposes." Final Rule, 63 Fed. Reg. at 1,756. Second, the Final Rule adds a provision "to allow for the capture, killing, and/or translocation of feral wolf-like animals, feral wolf hybrids, and feral dogs that exhibit evidence of hybridization, domestication, or socialization to humans." Id.

23.    On March 26, 1998, five of the nine Plaintiff organizations in this case[2] filed an action in the United States District Court for the District of New Mexico seeking to enjoin Defendant USFWS and other federal officials from implementing the Final Rule and Record of Decision to proceed with the Preferred Alternative identified in the FEIS on the grounds that these actions were contrary to the Endangered Species Act (ESA) and the National Environmental Policy Act (NEPA). See New Mexico Cattle Growers Ass'n v. United States Fish and Wildlife Serv., CIV No. 98-367 M/JHG (D.N.M. filed Mar. 26, 1998) (hereinafter "New Mexico Cattle Growers Ass'n" or "CIV No. 98-367 M/JHG").

24.    On October 28, 1999, the late Honorable E.L. Mechem issued a *Memorandum Opinion and Order* denying the requested relief by the plaintiffs in CIV No. 98-367 M/JHG and affirming the Defendant USFWS's Record of Decision and Final Rule regarding the Mexican gray wolf reintroduction program studied in the FEIS. See New Mexico Cattle

---

[2]Plaintiffs New Mexico Cattle Growers Association, Grant County Farm and Livestock Bureau, New Mexico Farm and Livestock Bureau, New Mexico Public Lands Council, Arizona Cattle Growers Association, and New Mexico Wool Growers, Inc., were named plaintiffs in CIV No. 98-367 M/JHG and are also named plaintiffs in the present action.

Growers Ass'n, CIV No. 98-367 M/JHG, slip. op. at 3, 47-48.

25.    Judge Mechem entered judgment in favor of the Defendants in New Mexico

Cattle Growers Ass'n, and the appeal from that judgment was dismissed by the Tenth

Circuit.  See id.

26.    Defendant USFWS continued to implement the Final Rule to reintroduce

Mexican gray wolves into the BRWRA.  During their reintroduction efforts, certain

management issues arose which led Defendant USFWS to consider translocating some of the

previously reintroduced Mexican gray wolves from the Primary Recovery Zone to the

Secondary Recovery Zone.

27.    On February 10, 2000, Defendant USFWS announced the availability of an

Environmental Assessment (EA) for its proposed translocation of Mexican gray wolves

throughout the BRWRA (specifically including the Secondary Recovery Zone).  The

proposed translocation involved the capture and relocation of Mexican gray wolves

previously released into the Primary Recovery Zone, such that wolves would be reintroduced

directly into the Secondary Recovery Zone rather than simply being allowed to disperse

naturally into the Secondary Recovery Zone.  [AR 103.]

28.    The EA issued on February 10, 2000, reported on the status of the

reintroduction program and included an updated discussion of the issue of livestock

depredation.  [AR 103.]  The EA explains that:

> Much of the best wolf habitat within the Primary Recovery Zone is already
> occupied by wolf family groups.  In other portions of the Primary Recovery
> Zone there have been wolf-livestock conflicts and concerns related to the

availability of native prey.  Dispersal of wolves from the Primary to the Secondary Recovery zones has occurred, and one wolf has dispersed 35+ miles into New Mexico.  The Gila Wilderness Area provides over one-thousand square miles of remote, mid- to high elevation country with good populations of large native ungulates (stable elk numbers, though depressed deer herd) and no permitted livestock.  However, for wolves to reach the best habitat within the Secondary Recovery Zone, they must pass through areas where they are exposed to increased risk (*e.g.*, active livestock management areas, residential areas, and roads).  Translocation of wolves to avoid management conflicts would also aid the dispersal of wolves into the historically high quality Mexican wolf habitat found in the Gila Wilderness.

[AR 103, at 645.]

29.   On March 17, 2000, Defendant USFWS issued a Finding of No Significant Impact (FONSI) and Decision Notice stating its decision to immediately implement the proposed translocation of Mexican gray wolves from the Primary Recovery Zone to the Secondary Recovery Zone.  [AR 124, 129.]  The FONSI concludes that:

Review of the impact assessment completed for the EIS, analysis of actual impacts from wolves previously released in the Primary Recovery Zone of the BRWRA, and consideration of all new information, demonstrates that the expected environmental and socio-economic impacts associated with the translocation of wolves for management purposes within the Secondary Recovery Zone is fully within the range of impacts revealed in the EIS for the BRWRA, and consistent with the management provisions authorized in the nonessential experimental population rule.

[AR 124, at 947.]  The FONSI further states, in relevant part, that:

Translocation of  wolves into the Secondary Recovery Zone for management purposes . . . has the potential to achieve the recovery goal more efficiently, and reduce some of the impacts associated with the wolf reintroduction project. With the management flexibility afforded through translocation, FWS can address wolf management conflicts as they arise.  The Secondary Recovery Zone provides many more sites for translocation where potential wolf management conflicts can be minimized than are available only within the Primary Recovery Zone.  For example, wolves which have been involved

in livestock depredations may be moved to the Gila Wilderness within the Secondary Recovery Zone where there is an extensive area without permitted livestock use. These translocations are expected to reduce depredation events and related impacts to ranching operations. With the management option to translocate wolves anywhere within the BRWRA, other management situations may be resolved (*e.g.*, replacement of lost mates), there may be fewer wolves killed in conflict situations, and fewer wolves which need to be returned to captivity if conflicts with those wolves cannot be resolved.

[AR 124, at 947.]

30.     In or about May 2002, Defendant USFWS discovered that one of the reintroduced Mexican gray wolves had given birth to a litter of pups with an abnormal appearance. Further testing subsequent to this discovery revealed that the pups were wolf-dog hybrids.

31.     During the implementation of the Mexican gray wolf reintroduction program, Defendant USFWS also received, investigated, and compiled reports from various individuals regarding possible livestock depredation by wolves as well as other possible conflicts between wolves and human endeavors. [Doc No. 77.]

32.     On April 30, 2003, Plaintiffs filed the present action, again seeking to enjoin further implementation of the Mexican gray wolf reintroduction program on the grounds that it violates Sections 7 and 10 of the ESA and NEPA.

33.     Plaintiffs' claims in this action are based in part on the following events or actions that transpired after Judge Mechem entered judgment in CIV No. 98-367 M/JHG:

        a.      Defendant USFWS's decision in March 2000 to proceed with translocation of Mexican gray wolves directly into the Secondary Recovery Zone;

b.      the discovery in the Spring of 2002 that one of the Mexican gray wolves reintroduced into the recovery area by Defendants had given birth to a litter of wolf-dog hybrid pups;

c.      the compilation of data regarding actual instances of livestock depredation and other conflicts between wolves and human activities occurring after Mexican gray wolves were released into the BRWRA.

34.     On November 3, 2003, Defendant USFWS completed another informal intra-agency consultation pursuant to Section 7 of the ESA which examined the translocation of wolves to the Secondary Recovery Zone and the agency's response to the discovery of the litter of wolf-dog hybrid pups.  The result of this consultation was that the State Supervisor concurred in the Mexican Gray Wolf Program Acting Coordinator's finding that the agency actions in question are "not likely to jeopardize" the Mexican gray wolf.  [AR 343a.]

35.     In the informal consultation documents issued in November 2003, the USFWS reasoned as follows:

In May 2002, Mexican wolf field project personnel discovered a wild-born litter of pups from the Pipestem Pack in New Mexico with markings and coloration that were inconsistent with typical Mexican wolf pups.  Subsequent genetic analysis determined them to be hybrids, the result of the alpha female breeding with most likely a domestic or feral dog.  To the best of our knowledge, this incident was the first documented case of a gray wolf hybridizing with a dog in North America.

The "Environmental Assessment for the Translocation of Mexican Wolves Throughout the Blue Range Wolf Recovery Area in Arizona and New Mexico" (EA) recognizes that the potential exists for Mexican wolves to interbreed with domestic or feral dogs or coyotes, but further recognizes the potential is small, with few anticipated events.  Where hybridization has been

know[n] to occur (i.e., Europe), hybrid survival is typically very poor and has no detectable impacts on wolf population viability or genetics. . . .

　　　　. . .

Hybridization was also addressed in the Federal Register rule by including a provision for the capture and removal of any feral wolf-like animal or wolf hybrid as determined by the Service. This provision is in place to safe-guard the genetic purity of the Mexican wolf population in the unlikely event hybridization occurs.

Standard operating procedures on the Mexican wolf project will continue to help ensure the genetic purity of the Mexican wolf population by genetically testing all animals that are captured in the wild that were not released (that is, those animals that are born in the wild). These procedures include taking blood from all captured Mexican wolves that are not radio-collared or marked. The blood is then sent to the Service's National Forensic Laboratory in Ashland, Oregon, for genetic testing to determine if indeed the animal is a Mexican wolf and further, to determine the parentage of the animal. These procedures have been in place since the inception of the reintroduction program in 1998, and will continue into the future.

[Supplemental AR at 1604, 1610-1612 (citations omitted).]

36.　　The literature cited in the informal consultation provides the following explanation of why hybridization is not thought to have a significant impact on the wolf species:

[D]ispersing female gray wolves do not return to their natal pack because the reproducing alpha pair holds dominance over reproduction. Rather, dispersing female wolves attempt to form a new pack with their mate. Because male dogs often do not assist in the rearing or care of offspring or form long-term bonds with females, offspring of wolf-dog matings may not survive in the wild; if they do survive, hybrids may not be well socialized and may have difficulty integrating into a wolf pack. The lack of assistance in the rearing of young by male dogs can be one of the reasons for the high pup mortality observed in Italian feral dog packs.

14

Physiological differences also distinguish dogs from wild wolf-like canids. Gray wolves and Ethiopian wolves follow the general breeding pattern of wolf-like canids: females have a single estrus per year, and males show seasonal increases in testosterone, testis size, and sperm production. Gray wolf females generally come into estrus from late January through April. Most dog breeds are an exception to this pattern: females can produce two litters per year, and males continuously maintain elevated testosterone levels. Estrus usually occurs twice a year, in spring and fall, although it may occur in any month. Consequently, the breeding cycle of male gray wolves may not be well timed for interbreeding with female dogs. In contrast, male dogs can potentially mate with dispersing female wolves during peak receptivity.

In conclusion, hybridization between gray wolves and domestic dogs does not appear to have materially affected the genetic composition of gray wolf populations. Offspring of male dogs and female wolves may rarely survive because male dogs provide limited parental care, whereas the reverse cross may not often occur because sperm production and estrus cycle are not coincident in dogs and gray wolves.

[Supp. AR S150, at S152 to S153.]

37.    Although not every wild-born Mexican gray wolf pup has been genetically tested, there have been no further discoveries of hybrid pups born to reintroduced Mexican gray wolves, and no additional hybrids were found among the other animals which have been tested.

38.    On April 12, 2004, Defendants supplemented the Administrative Record pursuant to a stipulated order by filing a summary report containing certain information from depredation reports compiled by Defendant USFWS between April 23, 1998, and August 25, 2003. [Ex. A to Doc No. 77.]   The summary report identifies 18 confirmed instances of predation by Mexican gray wolves during this period that resulted in the death of a cow or calf.  In addition, there are 7 confirmed instances of predation by Mexican gray wolves that

resulted in injury to a cow or calf.  The summary report also lists a number investigations which did not result in confirmation that cattle had been injured or killed by a wolf, or which involved other types of animals (such as sheep, horses, or dogs).

39.     Defendants' finding pursuant to Section 10(j) of the ESA that the designation of an experimental, nonessential population of Mexican gray wolves will further the conservation of the species is supported by substantial evidence in the Administrative Record, and Plaintiffs have not shown that the species will suffer a significant risk of irreparable harm as a result of this designation.

40.     Defendants' findings pursuant to Section 7 of the ESA that the reintroduction and translocation of Mexican gray wolves is not likely to adversely affect the species is supported by substantial evidence in the Administrative Record, and Plaintiffs have not shown that the species will suffer a significant risk of irreparable harm as a result of the reintroduction program or the decision to translocate wolves from the Primary Recovery Zone to the Secondary Recovery Zone.

41.     The risk of harm to Plaintiffs' social and economic interests caused by livestock depredation or other conflicts between reintroduced wolves and human activities is mitigated by the compensation and prevention funds administered by Defendant-Intervenors and the management flexibility provided by the Final Rule, which allows for the harassment, removal, translocation, or killing of "problem wolves" when warranted by the circumstances.

42.     With these mitigation measures in place, the balance of hardships does not

weigh in favor of preliminary injunctive relief.  Rather, the risk of irreparable harm to the species caused by granting such relief outweighs the risk of harm to Plaintiffs' interests.

43.    Because the intent and purpose of the Endangered Species Act is to give priority to the protection of endangered species, and the Administrative Record supports Defendants' findings that the reintroduction and translocation of an experimental, nonessential population of Mexican gray wolves in the BRWRA will further the conservation of this endangered species, the public interest does not weigh in favor of granting preliminary injunctive relief in this case.

44.    Plaintiffs have not met their burden of showing that preliminary injunctive relief is warranted.

## II.    LEGAL ANALYSIS

### A.    Preliminary Issues

Before proceeding to the merits of Plaintiffs' claims under the ESA and NEPA, this Court must address Defendants' concerns that judicial review of such claims, or portions thereof, is barred by certain jurisdictional defenses or preclusion doctrines.   These issues must be addressed before turning to the merits of Plaintiff's request for preliminary injunctive relief because this Court is without the authority to grant such relief if it lacks jurisdiction or if Plaintiffs' claims are precluded by the outcome of prior litigation.

#### 1.    Standing

Defendants first assert that Plaintiffs lack the standing required to establish a "case or controversy" under Article III of the United States Constitution.  At this stage of the

litigation, the Court rejects this assertion and concludes that Plaintiffs are entitled to their day in court. The requirements for standing to assert a NEPA claim in the Tenth Circuit are not onerous, and I find that Plaintiffs have made a sufficient showing to establish a "case or controversy" with respect to their NEPA claim at this stage of the litigation. See Comm. to Save the Rio Hondo v. Lucero, 102 F.3d 445, 448-49 (10th Cir. 1996); Sierra Club v. United States Dept. of Energy, 287 F.3d 1256, 1264 (10th Cir. 2002).

Similarly, the Supreme Court has broadened the zone of interests that can be used to establish standing to assert a claim under Section 7 of the ESA, and the interests asserted here fall within this zone. See Bennett v. Spear, 520 U.S. 154, 175-77 (1997) (interpreting 16 U.S.C. § 1536(a)(2)). While Bennett does not specifically address the zone of interests required for standing under Section 10(j) of the ESA, I note that this provision of the statute contains similar language requiring the agency to make determinations "on the basis of the best available information." 16 U.S.C. § 1539(j)(2)(B). Thus, the reasoning of Bennett also supports Plaintiffs' standing with respect to their claim under Section 10(j) of the ESA.

Further, I note that the claims asserted against Defendants under Section 7 and Section 10(j) of the ESA do not arise under the ESA's "citizen suit" provision. Rather, Sections 704 and 706 of the Administrative Procedures Act (APA) provide the mechanism for seeking judicial review regarding these claims. See Bennett, 520 U.S. at 171-74; Am. Rivers v. Nat'l Marine Fisheries Serv., 126 F.3d 1118, 1124-25 (9th Cir. 1997). Therefore, Plaintiffs' alleged failure to comply with the sixty-day notice requirement of the ESA's citizen-suit provision does not preclude Plaintiffs' from litigating these ESA claims under Sections 704

18

and 706 of the APA.  Plaintiffs' NEPA claim is likewise reviewable under Sections 704 and 706 of the APA.

### 2.     Ripeness and Final Agency Action

Defendants' point out that the Supreme Court has recently limited the scope of agency activities which can be subject to judicial review under these provisions of the APA and NEPA.  See Norton v. Southern Utah Wilderness Alliance, 124 S. Ct. 2373 (2004).  In particular, the Supreme Court has stated that in addition to being "final," agency actions must be "discrete" and "circumscribed" in order to qualify for judicial review under Section 702, 704, and 706(1) of the APA.  Id. at 2378.  The Supreme Court further explained that the "principal purpose" of such limitations on judicial review "is to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve."  Id. at 2381.  In other words, the APA does not provide courts with authority to enter "general orders compelling compliance with broad statutory mandates" or to inject themselves "into day-to-day agency management."  Id.

These limitations on judicial review under the APA accord with the reasoning of Gordon v. Norton, 322 F.3d 1213, 1219-22 (10th Cir. 2003), wherein the Tenth Circuit reached the conclusion that a rancher's ESA claims relating to Defendant USFWS's regulation of Northern Rocky Mountain gray wolves reintroduced into northwestern Wyoming were not ripe for judicial review.  In particular, the Tenth Circuit found that the rancher's ESA claims did not involve "final agency action" because Defendant USFWS "was

19

still in the decision-making process and was continuing to gather information on wolf activity and depredations."  Id. at 1220.

At the hearing on Plaintiff's *Motion for Preliminary Injunction*, Plaintiffs' counsel seemed to request that this Court review and enjoin all of Defendants' day-to-day management activities with respect to the reintroduction and translocation of Mexican gray wolves, including the agency's ongoing efforts to control "problem wolves."   Under the reasoning of Norton and Gordon, this Court is precluded from granting such a request and must instead limit its review to discrete and circumscribed decisions which have coalesced into "final agency action."

The Administrative Record does, however, contain two "final agency actions" which provide a basis for judicial review of  Plaintiffs' claims under Sections 7 and 10(j) of the ESA.  The finding that the designation of the reintroduced population of Mexican gray wolves as experimental and nonessential will "further the conservation of the species," as required by Section 10(j) of the ESA, is contained in the Final Rule issued in January 1998. The Final Rule is a discrete and final agency action that survives the limitations imposed in Norton and qualifies for judicial review under the APA with respect to Plaintiffs' ESA claim.

In November 2003 Defendant USFWS completed an informal consultation under Section 7 of the ESA regarding the translocation of Mexican gray wolves and the discovery of the litter of hybrid pups.  The result of this informal consultation, which concluded that continued reintroduction and translocation efforts are not likely to adversely affect the species, is also a "final agency action" subject to judicial review under the APA.  See

Bennett, 520 U.S. at 171-74; Am. Rivers, 126 F.3d at 1125.

###### 3.   **Mootness**

Defendants also claim that some of Plaintiffs' ESA and NEPA claims are precluded by the doctrine of mootness.  In particular, the claim that Defendants failed to consult under Section 7 of the ESA is mooted by the fact that Defendants engaged in and completed such a consultation in November 2003.  See Southern Utah Wilderness Alliance v. Smith, 110 F.3d 724, 729-30 (10th Cir. 1997); Am. Rivers, 126 F.3d at 1123-24.  Nevertheless, Plaintiffs may still challenge the result of that consultation as a "final agency action" under the APA, as noted above.

With respect to Plaintiffs' NEPA claim, the Court must follow the Supreme Court's reasoning in Norton, 124 S. Ct. at 2385, under which claims for supplementation of an environmental impact statement become moot if there is no longer an "ongoing 'major Federal action' that could require supplementation."  In the present case, the Court concludes that the Final Rule designating the reintroduced population of Mexican gray wolves as experimental and nonessential, as well as the overall recovery plan for the Mexican gray wolf, are akin to the land-use plan at issue in Norton, which was complete upon its approval and, therefore, could not provide the basis for a supplementation claim under NEPA.  Once approved, such programmatic planning documents are considered to be completed actions

that do not require additional NEPA analyses unless they are amended or revised.[3]

Norton does not necessarily preclude NEPA claims regarding ongoing project-level activities that serve to implement the broader goals of an agency's plan or program, so long as those activities qualify as discrete and final agency actions under the APA.  Such ongoing projects are more like the construction of the dam at issue in Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 367 (1989), which Norton acknowledged as being subject to a NEPA supplementation claim.

In this case, the Environmental Assessment (EA) and Finding of No Significant Impact (FONSI) regarding the decision to translocate wolves from the primary recovery zone to the secondary recovery zone qualifies as such a discrete and final agency action.  Therefore, Plaintiffs may proceed with their NEPA claim based on the EA and FONSI regarding the translocation of wolves.

### 4.    *Res Judicata* **or Claim Preclusion**

Having concluded that at least some of Plaintiffs' claims are sufficient to surmount the jurisdictional hurdles of standing, mootness, and ripeness, I next address Defendants' contention that these claims are precluded because they overlap with any challenge that was, or could have been brought, in New Mexico Cattle Growers Ass'n, CIV No. 98-367 M/JHG.

---

[3]While the parties have alluded to the possibility of amending the Final Rule and noted the existence of an administrative procedure for doing so, the Administrative Record does not reflect that such possibilities and procedures have been invoked, much less that they have culminated in a discrete and final agency action which is subject to judicial review at this point.  The Court cannot review agency actions based on the mere possibility that they might form the basis for such a rule change.

Under the doctrine of *res judicata*, or claim preclusion, "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in the prior action." Northern Natural Gas v. Grounds, 931 F.2d 678, 681 (10th Cir. 1991); accord Satsky v. Paramount Communications, Inc., 7 F.3d 1464, 1467 (10th Cir. 1993).

As noted above, Judge Mechem entered a final judgment on the merits of Plaintiff's NEPA and ESA claims in No. 98-367 M/JHG on October 28, 1999. Therefore, Plaintiffs are precluded from litigating their claims in the present action if Defendants can show that these same claims were or could have been raised in the prior litigation and that Plaintiffs were parties or privies to the prior litigation.

I conclude that Plaintiffs' challenge to the EA and FONSI regarding translocation of wolves in the Spring of 2000, as well as their challenge to the result of the informal consultation regarding translocation and hybridization issued in November 2003, could not have been raised in the prior litigation. Those actions had not yet occurred as of the date of Judge Mechem's judgment on October 28, 1999. See generally Petromanagement Corp. v. Acme-Thomas Joint Venture, 835 F.2d 1329, 1332 (10th Cir. 1988) (adopting the "transactional approach" to determining whether claims in present and prior litigation are the same or identical).

Plaintiffs' challenge to the Final Rule issued in January 1998, which provides the "final agency action" under Section 10(j) of the ESA, presents a closer question because this rule was issued prior to the litigation before Judge Mechem, and Judge Mechem's

*Memorandum Opinion and Order* specifically addressed the issue of hybridization.  Thus, applying the doctrine of *res judicata* to Plaintiff's present claim under Section 10(j) of the ESA is likely to turn on whether all the Plaintiffs in this action are in privity with the plaintiffs in the prior litigation.  Determining whether parties to present and prior litigation are in privity with one another can be a difficult task because "[t]he term 'privity' is now used to describe various relationships between litigants that would not have come within the traditional definition of that term."  Richards v. Jefferson County, 517 U.S. 793, 798 (1996) (citing Restatement (Second) of Judgments, supra, ch. 4); see also 18 James Wm. Moore *et al.*, Moore's Federal Practice § 131.40[3][a], at 131-135 (3d ed. 2004) ("[T]he concept of privity is an amorphous concept that is difficult to define.").

I find it unnecessary to resolve the difficult issue of privity at this stage of the litigation because Plaintiffs are unlikely to succeed on the merits of their claim under Section 10(j) of the ESA even if the doctrine of *res judicata* does not preclude this claim.  Even when doctrines of *res judicata* or *stare decisis* do not apply, courts are by no means precluded from relying on prior court decisions as persuasive authority. In this regard, the Supreme Court has acknowledged that:  "'The labor of judges would be increased almost to the breaking point if every past decision could be reopened in every case, and one could not lay one's own course of bricks on the secure foundation of the courses laid by others who have gone before him.'"  Hubbard v. United States, 514 U.S. 695, 711 (1995) (quoting B. Cardozo, The Nature of the Judicial Process 149 (1921)).  As discussed in more detail below, the Court finds Judge Mechem's *Memorandum Opinion and Order* in the prior litigation, as

well as the Tenth Circuit's opinion in <u>Wyoming Farm Bur. Fed'n v. Babbitt</u>, 199 F.3d 1224

(10th Cir. 2000), to be persuasive authority with respect to the designation of experimental,

nonessential populations under Section 10(j) of the ESA.

**B.      Standard of Review and Requirements for Preliminary Injunctive Relief**

This Court next addresses the requirements that Plaintiffs must satisfy in order to

obtain preliminary injunctive relief.  In applying these requirements, it must be noted that the

current procedural posture of this case is unusual in the following respects.  First, there has

been an unusually long delay between the filing of Plaintiffs' *Complaint* and the completion

of briefing on their motion for a preliminary injunction.  Plaintiffs did not file their motion

for a preliminary injunction until more than five months after the filing of their *Complaint*.

Further, the parties stipulated to an extended briefing schedule in which briefing on

Plaintiff's motion was not completed for an additional four months.

Second, the standard for judicial review of Plaintiffs' claims under the ESA and

NEPA is provided by Sections 706 of the APA, 5 U.S.C. § 706.  <u>See</u> <u>Wyo. Farm Bureau</u>

<u>Fed.</u>, 199 F.3d at 1231 (reviewing ESA and NEPA claims); <u>Friends of the Bow v.</u>

<u>Thompson</u>, 124 F.3d 1210, 1214-15 (10th Cir. 1997) (similar).  The Tenth Circuit has stated

that district courts are to conduct such judicial review based on the Administrative Record

and the Federal Rules of Appellate Procedure rather than conducting a *de novo* trial and

acting as an independent factfinder.  <u>See</u> <u>Olenhouse v. Commodity Credit Corp.</u>, 42 F.3d

1560, 1579-80 (10th Cir. 1994).

In this case, the Administrative Record designated by the Federal Defendants is

extremely voluminous and is reproduced on three compact discs plus the summary report filed on April 12, 2004.   The parties also have filed several motions concerning supplementation of the Administrative Record or consideration of materials outside the Administrative Record.  Briefing on these motions was not completed until February 2004, and the parties' continued to submit extra-record materials at the time of the hearing Plaintiff's motion on June 29, 2004.

The Court considers such extra-record materials for certain limited purposes related only to the preliminary injunction proceeding (such as establishing Plaintiffs' standing, applying traditional equitable principles used in deciding whether preliminary injunctive relief is warranted, and determining if these materials fall within any of the recognized exceptions to the general rule limiting judicial review to the Administrative Record designated by the agency).  Apart from these exceptions, however, the merits of Plaintiffs' claims must be decided based on the Administrative Record designated by Defendant USFWS, without consideration of *post hoc* rationalizations.  See generally Bar MK Ranches v. Yeutter, 994 F.2d 735, 740 (10th Cir. 1993); Custer County Action Ass'n v. Garvey, 256 F.3d 1024, 1028 n.1 (10th Cir. 2001);  Am. Mining Cong. v. Thomas, 772 F.2d 617, 626 (10th Cir.1985)); Commercial Drapery Contractors, Inc. v. United States, 133 F.3d 1, 7 (D.C. Cir. 1998).   Thus, the fact that the Court has examined the parties' extra-record materials for other, limited purposes does not necessarily mean that they are considered part of the Administrative Record, that Defendant USFWS erred in omitting them from the Administrative Record, or that Defendants may correct any errors in the Administrative

Record through *post hoc* rationalizations.   See Am. Mining Cong., 772 F.2d at 626;

Olenhouse, 42 F.3d at 1574-75

In addition to confining judicial review to the Administrative Record, the Tenth

Circuit has held that the requirements for granting injunctive relief under Section 706 of the

APA may differ in other respects from the traditional equitable principles that ordinarily

govern such relief.  To prevail on a claim for preliminary injunctive relief under traditional

equitable principles, it is Plaintiffs' burden to show (1) a substantial likelihood of prevailing

on the merits of their claims, (2) a significant risk that irreparable harm will result if

preliminary injunctive relief is not granted, (3) that the threatened injury to Plaintiffs'

interests outweighs the harm that granting such relief may cause to the opposing party, and

(4) that the public interest will not be adversely affected by granting such relief.  See Greater

Yellowstone Coalition v. Flowers, 321 F.3d 1250, 1255, 1258 (10th Cir. 2003).

If an agency action falls short of the standards set forth in Section 706 of the APA,

however, Congress has imposed a mandatory duty on the reviewing court to order the

applicable remedy provided therein, including injunctive relief to compel agency action

unlawfully withheld or unreasonably delayed.  See Forest Guardians v. Babbitt, 174 F.3d

1178, 1187 (10th Cir. 1999).  Thus, in the context of judicial review under Section 706 of

the APA, Plaintiffs' entitlement to preliminary injunctive relief rests primarily on the

likelihood they will succeed on the merits of their claim that Defendant's actions or

omissions fall short of the standard set forth in that statutory provision.[4]

Section 706 of the APA provides that Courts shall set aside agency actions that are found to be "arbitrary and capricious." See 5 U.S.C. § 706(2)(A); Marsh, 490 U.S. at 376; Friends of the Bow, 124 F.3d at 1218. Under this standard, "the reviewing court 'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" Marsh, 490 U.S. at 378 (quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971)). An agency acts arbitrarily and capriciously if it "entirely fails to consider an important aspect of the problem" or "offers an explanation for its decision that runs counter to the evidence before it or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n v State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

Review of agency action under this standard requires a "searching and careful" inquiry. Volpe, 401 U.S. at 416. In particular, "courts should not automatically defer to the agency's express reliance on an interest in finality without carefully reviewing the record and satisfying themselves that the agency has made a reasoned decision based on its evaluation

---

[4]Defendants point out that a heightened standard for granting preliminary injunctive relief may apply when such relief will alter the *status quo*. See SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d 1096, 1098 (10th Cir. 1991). However, each of the parties seeks to alter the *status quo* in some respects. Plaintiffs seek to change the *status quo* by removing wolves previously released into the wild, and Defendants seek to change the *status quo* by releasing or translocating additional wolves into the wild. Thus, the Court finds that this issue is not dispositive because, as noted above, the APA standard controls, and each party seeks to preserve the *status quo* in part and change the *status quo* in part.

of the significance--or lack of significance--of the new information." <u>Marsh</u>, 490 U.S. at 378; <u>accord</u> <u>Olenhouse</u>, 42 F.3d at 1574-75; <u>Sea Robin Pipeline Co. v. F.E.R.C.</u>, 127 F.3d 365, 370 (5th Cir. 1997); <u>Herron v. Shalala</u>, 19 F.3d 329, 333 (7th Cir. 1994).

Deference to an agency's expertise is required, however, when resolution of the dispute "involves primarily issues of fact," such as whether the conclusions stated in an existing environmental impact statement are inaccurate or incomplete in light of new information. <u>Marsh</u>, 490 U.S. at 376-77.  "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." <u>Id.</u> at 378; <u>accord</u> <u>Friends of the Bow</u>, 124 F.3d at 1218; <u>Holy Cross Wilderness Fund v. Madigan</u>, 960 F.2d 1515, 1523-24 (10th Cir. 1992).  Such deference to agency expertise in resolving factual disputes accords with the Supreme Court's recent pronouncement that Section 706 of the APA is designed "to protect agencies from judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both the expertise and information to resolve." <u>Norton</u>, 124 S. Ct. at 2381.

### C.    <u>Likelihood of Success on the Merits</u>

I now turn to the first and most important factor used in determining whether Plaintiffs' are entitled to preliminary injunctive relief:  their likelihood of success on the merits.  In addressing this factor, I note that the briefing on the merits of Plaintiffs' claims has not yet been completed, and it would not be fair to decide the merits of these claims at this juncture without affording each of the parties the opportunity to complete such briefing.

Therefore, the following analysis should be considered preliminary and subject to reconsideration in light of the more detailed arguments presented in the parties' briefs on the merits.

### 1.   <u>Plaintiffs' NEPA Claim</u>

The essence of Plaintiffs' NEPA claim is that Defendants have not fulfilled their obligations under NEPA and must cease the Mexican gray wolf reintroduction program and retrieve or destroy all wolves released pursuant to that program pending completion of a supplemental environmental impact statement (SEIS) under NEPA.  Defendants deny these contentions and assert that the issues raised by Plaintiffs' NEPA claim are adequately addressed in the FEIS and the EA.

The Supreme Court has interpreted NEPA and its implementing regulations to mean that an SEIS must be prepared "[i]f there remains 'major federal actio[n]' to occur," and if there exists new information that is "sufficient to show that the remaining action will 'affec[t] the quality of the human environment' in a significant manner or to a significant extent not already considered."  <u>Marsh</u>, 490 U.S. at 374; <u>accord</u> <u>Norton</u>, 124 S. Ct. at 2384. In particular, NEPA's implementing regulations require federal agencies to supplement an environmental impact statement "if '[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns,' or '[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.'"  <u>Friends of the Bow</u>, 124 F.3d at 1218 (quoting 40 C.F.R.§ §§ 1502.9(c)(1)(i), (ii) (1996)); <u>accord</u> <u>Norton</u>, 124 S. Ct. at 2384.

On the other hand, "an agency need not supplement an EIS every time new information comes to light after the EIS is finalized.  To require otherwise would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made." Marsh, 490 U.S. at 373; accord Friends of the Bow, 124 F.3d at 1218.  Further, once an agency action is completed, "[t]here is no ongoing 'major Federal action' that could require supplementation" of an EIS.  Norton, 124 S. Ct. at 2385.

Even when supplementation of an EIS is required, "it is well established that NEPA 'does not mandate particular results,' nor does it require agencies 'to elevate environmental concerns over other valid concerns.'" Lee v. United States Air Force, 354 F.3d 1229, 1237 (10th Cir. 2004) (quoting Utahns for Better Transp. v. U.S. Dep't of Transp., 305 F.3d 1152, 1162-63 (10th Cir.2002)) (citations omitted).  "Because NEPA imposes procedural rather than substantive requirements, '[t]he role of the courts in reviewing compliance with NEPA is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary and capricious.'" Id. (quoting Utahns for Better Transp., 305 F.3d at 1163).

An agency's determination that an existing environmental impact statement need not be supplemented before proceeding with a major federal action is reviewed under the "arbitrary and capricious" standard in Section 706(2)(A) of the APA.  Under this standard, courts examine whether the agency has taken "a 'hard look' at the new information to assess whether supplementation might be necessary." Norton, 124 S. Ct. at 2384.

The issues which form the basis for Plaintiffs' claim that the FEIS and EA are inadequate fall into the following general categories:   (1) livestock depredation; (2) hybridization between Mexican gray wolves and other species of canids; and (3) translocation of wolves from the Primary Recovery Zone to the Secondary Recovery Zone. Each of these categories is addressed below.

### a.    Depredation

Plaintiffs acknowledge that the actual instances of livestock depredation by reintroduced Mexican gray wolves that have been confirmed and reported by Defendants are roughly in accordance with the estimates provided in the FEIS and the EA.  [Doc. No. 82, at 44.]  Nevertheless, Plaintiffs contend that an SEIS is necessary because they believe the reintroduced Mexican gray wolves are causing damage to livestock at much greater levels than Defendants have previously estimated or acknowledged.  To support this contention, Plaintiffs have submitted a number of extra-record materials containing anecdotal accounts of livestock depredation and other conflicts between the reintroduced wolves and human activities.  Plaintiffs also point to a journal article published in 2003 (the Oakleaf article) which suggests that the number of confirmed depredations by Northern Rocky Mountain gray wolves on a grazing allotment in Idaho for which ranchers are receiving compensation is only about one-eighth of the actual depredations that are occurring on that particular allotment.  (Supp. AR 18).

In essence, the extra-record evidence presented by Plaintiffs simply presents opinions that conflict to some extent with the opinions of Defendants' experts on the issue of how

much damage to livestock in and around the BRWRA is caused by reintroduced Mexican gray wolves.  The Tenth Circuit has repeatedly held that "'agencies are entitled to rely on their own experts so long as their decisions are not arbitrary and capricious.'"  Custer County, 256 F.3d at 1036 (quoting Colo. Envtl. Coalition v. Dombeck, 185 F.3d 1162, 1173 n.12 (10th Cir. 1999)); accord Lee, 354 F.3d at 1242; Wyoming Farm Bur. Fed'n, 199 F.3d at 1241.  In this case, Plaintiffs' extra-record evidence only demonstrates that there exists a factual disagreement about the cause or extent of livestock depredation and other conflicts between wolves and human activities.  Such a factual disagreement "is an insufficient basis for admitting extra-record evidence or for holding an EIS inadequate."  Lee, 354 F.3d at 1244.  "[T]he mere presence of contradictory evidence does not invalidate the Agencies' actions or decisions."  Wyoming Farm Bur. Fed'n, 199 F.3d at 1241.

Further, the Oakleaf article does not necessarily undermine the conclusion that the agency's decision-making in this case is supported by substantial evidence in the Administrative Record.  The Oakleaf article concerns a study of livestock depredation on a single grazing allotment in a rugged and timbered region of Idaho where a pack of Northern Rocky Mountain gray wolves was known to be present and in need of "control action." (Supp. AR 18, at s295.)   The Oakleaf article states that this

> wolf pack was involved in 6 documented calf depredations on the [allotment] (4 radiomarked, 2 unmarked) during the 2-year study.  Based on mortality rates of the marked calf population, we further estimated that wolves killed 16 calves on the [allotment] during the two years of the study . . . .  Wolf-caused calf mortality detection rates without mortalities found by study personnel were 1 of 8.0 wolf kills . . . .  Similarly, detection rates for nonpredation mortalities without mortalities found by study personnel were 1 of 11.5 deaths.

> Because the [allotment] was grazed by 688 cow-calf pairs each season, we estimated that wolves killed approximately 1.2% (16 estimated wolf kills/1,376 calves) of the calf population each year, while nonpredation deaths accounted for 2.3% of the calf population. . . .

[Supp. AR 18, at s298.]

In order to conclude that the 6 documented calf depredations cited in the Oakleaf article support an eight-fold increase in the number of livestock depredations by the entire population of reintroduced Mexican gray wolves throughout the wolf recovery area in Arizona and New Mexico, one would have to make the following inferences. First, one would have to accept the Oakleaf article's inference that these 6 documented calf depredations support the estimate that a total of 16 calves were killed on the Idaho allotment during the study. Second, one would have to infer that the entire population of reintroduced Mexican gray wolves throughout the recovery area in Arizona and New Mexico behave the same as one particular pack of Northern Rocky Mountain gray wolves on a rugged and timbered allotment in Idaho, even though the Oakleaf article acknowledges that the particular wolf pack inhabiting the Idaho allotment was in need of "control actions" and was not necessarily representative of all wolves. [Supp. AR 18, at s295.] Third, one would have to infer that the particular allotment studied in the Oakleaf article is an exact microcosm of the entire Mexican gray wolf recovery area in Arizona and New Mexico, even though the Oakleaf article acknowledged that the detection ratio for livestock depredations caused by wolves "may be lower (*e.g.*, ½) in less timbered or rugged country." [Supp. AR s295, s300.]

Courts generally do not accept conclusions drawn by piling inference upon inference

in this manner. See NLRB v. Meinholdt Mfg., Inc., 451 F.2d 737, 738 (10th Cir. 1971). Plaintiffs have shown no reason why administrative agencies are required to do so in determining whether or not to prepare an SEIS.

Rather than mandating particular results, NEPA simply requires "an agency to take a 'hard look' at the new information to assess whether supplementation might be necessary." Norton, 124 S. Ct. at 2384.  In this case, there is substantial evidence in the Administrative Record that Defendants took a "hard look" at the issue of livestock depredation, as evidenced by the  extensive discussion of this topic in the FEIS and the EA, as well as the inclusion of the Oakleaf article in the supplemental Administrative Record.

Further, the Oakleaf article's observation that the Idaho ranchers did not detect all instances of livestock depredation caused by the wolves in their allotment accords with the findings in the FEIS to the effect that "some ranchers may experience significant losses" and that "[s]ome cattle likely will be killed but not detected . . . ."  [FEIS-AR 25, at 4-4, 4-9.] To the extent that the FEIS and the EA already acknowledged and disclosed these facts, their subsequent confirmation by the study discussed in the Oakleaf article is not "new" information on which this Court can require supplementation of the FEIS and EA.

Further, Defendants' conclusion that the information in the Oakleaf article is not significant enough to warrant an SEIS accords with the Oakleaf article's own findings that "[t]he overall effect of wolves on the calf population within the [allotment] was not significant" and that "predatory interactions occurred infrequently despite the spatial proximity of wolves to cattle."  [Supp. AR 18, at s299.]  Contrary to Plaintiffs' assertions,

the Oakleaf article does not stand for the proposition that the overall effect of wolves on the

calf population is eight times greater (or more significant) than previously anticipated.

Rather, the article simply suggests that the method of compensating ranchers currently used

by Defendant-Intervenors imposes too strict a standard of proof on ranchers who do not have

the scientific equipment or resources employed by the authors of the Oakleaf article in

determining the causes of livestock losses.  While the suggestion that Defendant-Intervenors

adopt a more generous policy with respect to compensating ranchers for livestock losses

under this voluntary and privately-administered program may very well prove to be a fruitful

topic of discussion among policymakers, this suggestion does not provide grounds for a court

to determine that Defendants acted arbitrarily and capriciously in declining to prepare an

SEIS based on new information concerning the issue of livestock depredation.

### b.      Hybridization

Plaintiffs next assert that supplementation of the FEIS and the EA is required under

NEPA because of new information concerning hybridization between reintroduced wolves

and other canids (such as dogs and coyotes).  In support of this assertion, Plaintiffs point to

a single documented instance in the Spring of 2002 in which a litter of wolf-dog hybrid pups

was born to a female Mexican gray wolf that had been reintroduced into the recovery area

by Defendant USFWS.  Plaintiffs also selectively cite the scientific literature on wolf

hybridization to support their claim that this issue requires further study in the form of an

SEIS.

The discovery of the litter of hybrid pups born in the Spring of 2002 is undoubtedly

new information, since no hybrid pups born to reintroduced wolves had ever been documented prior to this discovery.  Plaintiffs have not shown, however, that Defendants acted arbitrarily or capriciously in concluding that this new information is not significant enough to warrant an SEIS under the standard articulated in Marsh, 490 U.S. at 372-74, and Norton, 124 S. Ct. at 2384.

As noted above in the Court's findings of fact, the issue of hybridization was discussed in Appendix A of the FEIS, and that discussion is supported by scientific literature in the Administrative Record.  The discovery of the litter of hybrid pups in the Spring of 2002 is specifically addressed in the intra-agency consultation documents prepared pursuant to Section 7 of the ESA in November 2003, and again this discussion is supported by the scientific literature in the supplemental Administrative Record regarding that consultation.

These agency discussions in the Administrative Record present plausible reasons why the single documented instance of a litter of wolf-dog hybrid pups does not change the earlier prediction that hybridization does not present a significant danger to the conservation of the species.  The fact that it is biologically possible for wolves to breed with other canids (including dogs and coyotes) and produce a litter of hybrid pups was known and acknowledged in the FEIS and supporting literature.  The discovery of the litter of hybrid pups in the Spring of 2002 simply confirms this previously  known fact.

In the appendix to the FEIS and the subsequent informal consultation documents, Defendants explain that hybridization is not likely to adversely affect the genetic integrity of the Mexican gray wolf subspecies for the following reasons.  First, there is scientific

literature to support the proposition that hybrid pups are unlikely to survive and mature to reproductive age in the wild because of differences in behavior between wolves and other canids with regard to mating, socialization, and the rearing of offspring.  Second, Defendants have undertaken measures to minimize the likelihood that further hybrid pups will be born and to monitor the existing population of reintroduced wolves for the purpose of ensuring that any hybrid pups  that are born are removed from the wolf population before they reach reproductive age.

Plaintiffs point out that each of these measures, standing alone, does not provide a guarantee against hybridization.  For example, the birth of the litter of hybrid pups in the Spring of 2002 occurred despite the release of "mated pairs" of Mexican gray wolves, which is one of the measures designed to reduce the risk of hybridization.  There is also evidence that Defendants' monitoring program has not successfully captured and genetically tested each and every pup born in the wild to determine whether it is a hybrid (although no further hybrid animals have been discovered among those that were tested).

These facts do not necessarily undermine Defendants' conclusions regarding the issue of hybridization, however, because Defendants may reasonably view the effects of the natural or man-made obstacles to hybridization cumulatively rather than in isolation from one another.  Under this view, if the wolves overcome the initial obstacles to hybridization (such as the release of "mated pairs") and give birth to hybrid pups, then such hybrid pups still must overcome the secondary obstacles posed by Defendants' procedure for capturing, testing, and killing such hybrids.  The undisputed fact that the litter of hybrid pups born in

the Spring of 2002 was captured, tested, and killed as contemplated by this procedure supports Defendants' conclusion that hybridization does not pose a serious danger to the genetic integrity of the species.

Even if the hybrid pups escape from Defendants' monitoring procedures, they must still overcome a series of natural obstacles to further hybridization, such as those presented by the differences between wolves and other canids with respect to socialization and the rearing of offspring. While Plaintiffs may disagree with the scientific literature on which Defendants rely to support their view that such natural barriers to hybridization exist, the existence of such a factual dispute concerning a topic within Defendants' specialized area of expertise does not provide grounds for setting aside their decision-making as "arbitrary and capricious" under the APA. See Custer County, 256 F.3d at 1036 (quoting Colo. Envtl. Coalition, 185 F.3d at 1173 n.12); accord Lee, 354 F.3d at 1242; Wyoming Farm Bur. Fed'n, 199 F.3d at 1241.

Similarly, Plaintiffs' disagreement with Defendants' conclusions regarding the reliability of genetic testing of various wolf subspecies and hybrid animals does not provide grounds for requiring supplementation of the FEIS or the EA in this instance. I note that similar disagreements regarding the reliability of genetic testing or other methods used to determine if particular animals or subspecies are in fact hybrids was extensively reviewed in prior litigation and found not to provide a basis for setting aside wolf reintroduction actions. See, e.g., Wyoming Farm Bur. Fed'n, 199 F.3d at 1240-41; New Mexico Cattle Growers Ass'n, CIV No. 98-367 M/JHG, slip. op. at 38-39 (D.N.M. October 28, 1999)

(unpublished memorandum opinion and order).  The Court finds these prior opinions to be persuasive authority in this case.

### c.   Translocation

The third category of issues raised in Plaintiffs' *Motion for Preliminary Injunction* concern Defendants' decision to translocate wolves from the Primary Recovery Zone in Arizona to the Secondary Recovery Zone in New Mexico.  This issue is not new.  The consequences of the wolves' presence in the Secondary Recovery Zone following their reintroduction, and the authority of Defendant USFWS to translocate wolves into that area, were already studied and subjected to public comment in the FEIS and/or the Final Rule. The main difference between the natural dispersal initially contemplated under the "Preferred Alternative" in the FEIS and the active translocation effort contemplated in the EA and FONSI prepared in the first quarter of 2000 is that the translocation effort allows greater control over the movement of the wolves and involves the use of holding pens at specific translocation sites as well as temporary restrictions on public access around those sites. Plaintiffs do not allege any new information relevant to the use of the holding pens or temporary restrictions on public access.

Rather, they premise their argument on the belief that translocation serves as a way of concentrating "problem wolves" in the secondary recovery zone, and that such concentration of "problem wolves" is likely to lead to higher levels of livestock depredation and other conflicts.  Plaintiffs assert that such negative consequences of translocation to the Secondary Recovery Zone are going to occur (or have occurred) because of the lack of

40

availability of other prey for the wolves, combined with the remote and rugged nature of the terrain in the Gila Wilderness, which allegedly makes monitoring and controlling the wolves in this location more difficult.  According to Plaintiffs, these concerns were not adequately addressed or subjected to public scrutiny in the FEIS and the EA.

Plaintiffs have not shown that Defendants acted arbitrarily or capriciously in declining to prepare an SEIS regarding these issues. In the EA and FONSI issued in the Spring of 2000, Defendants reasoned that translocation provides a mechanism by which "problem wolves" can be dispersed throughout the entire recovery area rather than being concentrated in the Primary Recovery Zone.  Defendants further predict that such dispersal or translocation of "problem wolves" into the Gila Wilderness is less likely to cause livestock depredation, and more likely to further the goal of conservation of the species, because the Gila Wilderness contains "an extensive area without permitted livestock use" where wolves are less likely to cross paths with livestock or pets.  Defendants also note that translocation provides the opportunity to resolve "other management situations," which may include "genetic management" to reduce the risk of hybridization (*e.g.*, replacement of lost mates and genetic testing of wolves recaptured for purposes of translocation).  [AR 103, 124.]

Again, Plaintiffs simply express a different opinion about the factual issue of what the consequences of the translocation to the Secondary Recovery Zone are likely to be.  Such a difference of opinion "does not invalidate the Agencies' actions or decision." Wyoming Farm Bur. Fed'n, 199 F.3d at 1241; accord Custer County, 256 F.3d at 1036; Colo. Envtl. Coalition, 185 F.3d at 1173 n.12; Lee, 354 F.3d at 1242.  The preceding analysis of the

issues of livestock depredation and hybridization only lends further support to this conclusion, as Plaintiffs have not presented new and significant information concerning livestock depredation by so-called "problem wolves" that have been translocated into the Secondary Recovery Zone, and such translocation serves to reduce the risk of hybridization by providing opportunities for replacement of lost mates and genetic testing of wolves captured during the translocation process.

For all of the above reasons, I conclude that Plaintiffs have not shown a likelihood of success on the merits of their NEPA claim regarding the reintroduction and translocation of Mexican gray wolves.  The Administrative Record adequately and explicitly supports Defendants' analysis regarding the issues of wolf hybridization, livestock depredation, and the translocation of wolves to the Secondary Recovery Zone.  In particular, it appears that Defendants satisfied their obligations under NEPA by preparing the FEIS, <u>Final Rule</u>, EA, and FONSI, all of which responded in a specific and timely manner to the comments raised during the public comment period.  The Administrative Record shows that the agency took a "hard look" at the effects of this action, as required by NEPA, before proceeding to reintroduce wolves directly into the Secondary Recovery Zone.  <u>See</u> <u>Robertson v. Methow Valley Citizens Council</u>, 490 U.S. 332, 350 (1989).

### 2.      <u>Plaintiffs' ESA Claims</u>

The Court next turns to Plaintiffs' claims that Defendants are in violation of the consultation requirements in Section 7 of the ESA and that the designation of the reintroduced population of Mexican gray wolves will not further the conservation of the

species as required by Section 10(j) of the ESA.  Defendants have made findings as a result of informal consultation under Section 7, and the Final Rule contains findings regarding the conservation of the species under Section 10(j).  Therefore, the question before the Court is whether these findings are arbitrary, capricious, or unsupported by substantial evidence in the record.  Plaintiffs have failed to show that Defendants' findings fall short of these standards.

### a.   Section 7 Consultation

Section 7(a)(2) of the ESA states, in relevant part, that:

> Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species. . . .  In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.

16 U.S.C. § 1536(a)(2).  Under the USFWS regulations implementing this statute, "[e]ach Federal agency shall review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat." 50 C.F.R. § 402.14(a).  Federal agencies may conduct such reviews and make such determinations through preparation of a "biological assessment," see 50 C.F.R. §  402.12, or through "informal consultation" with the USFWS, see 50 C.F.R. § 402.13.  "Informal consultation is an optional process that includes all discussions, correspondence, etc., between the [USFWS] and the Federal agency . . . designed to assist the Federal agency in determining whether formal consultation or a conference is required."  50 C.F.R. §  402.13(a).  "During informal consultation, the

[USFWS] may suggest modifications to the action that the Federal agency and any applicant could implement to avoid the likelihood of adverse effects to listed species or critical habitat." 50 C.F.R. § 402.13(b).

If the Federal agency determines that an action "may affect listed species or critical habitat," then "formal consultation is required," 50 C.F.R. § 402.14(a), unless "as a result of the preparation of a biological assessment under § 402.12 or as a result of informal consultation with the [USFWS] under § 402.13, the Federal agency determines, with the written concurrence of the Director [of the USFWS], that the proposed action is not likely to adversely affect any listed species or critical habitat," 50 C.F.R. § 402.14(b); accord 50 C.F.R. §§ 402.12(k) and 402.13(a). In cases where there is both a determination of "not likely to adversely affect" and a written concurrence from the USFWS, the consultation process terminates and no further action is necessary. See 50 C.F.R. §§ 402.13(a) and 402.14(l)(3).

In this case, Defendant USFWS completed this informal consultation procedure with respect to the reintroduction program for the Mexican gray wolf on two occasions: once on May 31, 1995, and again in November 2003. Both of these informal consultations resulted in findings that the reintroduction and translocation of the nonessential, experimental population of Mexican gray wolves was not likely to adversely affect the species. The agency reasoned that if the reintroduction program were to succeed and result in a sustainable population of Mexican gray wolves inhabiting the recovery area, then this development would be of great benefit to the conservation of the species. If, on the other

44

hand, the reintroduction program did not succeed and all of the reintroduced wolves were killed or otherwise removed from the recovery area, then the agency concluded that the species would not be jeopardized because of the ongoing existence of the captive-breeding program from which the population of reintroduced wolves was derived.

Plaintiffs assert that this reasoning is flawed and that the reintroduction of Mexican gray wolves into the recovery area is likely to adversely affect the species by destroying its genetic integrity through hybridization. They further assert that it is arbitrary and capricious for the agency to conclude that the reintroduction program will not adversely affect the species in this manner, and that formal consultation under Section 7 is required. For these reasons, Plaintiffs request that the reintroduction program be stopped pending completion of such formal consultation.

I conclude that Plaintiffs have not shown a substantial likelihood of prevailing on the merits of this Section 7 claim for essentially the same reasons expressed above in the discussion of the hybridization issue as it pertains to Plaintiffs' NEPA claim. Defendants' rationale and supporting evidence regarding their informal consultations under Section 7 are set forth with sufficient detail in the Administrative Record (as supplemented to include the November 2003 consultation), and Plaintiffs' disagreement with Defendants' opinion regarding the potential for hybridization does not provide a basis for setting aside these informal consultations or requiring a formal consultation at this time. See  See Wyo. Farm Bureau Fed., 199 F.3d at 1231; Forest Guardians v. United States Forest Serv., No. CIV. 01-504 MCA/KBM, slip. op. at 12-13 (D.N.M. Mar. 31, 2004) (unpublished memorandum

opinion and order affirming result of informal consultation under Section 7 of the ESA).

### b.     Section 10(j) Finding

Plaintiffs' final contention is that Defendants acted arbitrarily and capriciously by finding that the designation of an experimental, nonessential population of Mexican gray wolves will "further the conservation of the species," as required by Section 10(j) of the ESA. This designation, and the concomitant finding that it will further the conservation of the species, were made in the Final Rule issued in January 1998, which was the subject of the prior litigation adjudicated by Judge Mechem. See New Mexico Cattle Growers' Ass'n, No. CIV 98-367 M/JHG, supra.

Plaintiffs challenge Defendants finding under Section 10(j) in this case for a slightly different reason than was previously articulated in No. CIV 98-367 M/JHG. In the prior litigation, Plaintiffs claimed that the reintroduced population of Mexican gray wolves were themselves hybrids, whereas they now claim that the reintroduced population will breed with other canids (such as dogs or coyotes) and produce a "hybrid swarm." The factual contentions supporting Plaintiffs' hybridization concerns were addressed above, and this Court's analysis of these contentions under Section 706 of the APA need not be repeated again.

Plaintiffs' claims under Section 10(j) of the ESA are a variation of those previously adjudicated in Defendants' favor in New Mexico Cattle Growers' Ass'n and Wyoming Farm Bur. Fed'n, 199 F.3d at 1233-39. I find the opinions issued in those cases to be persuasive with respect to applying Section 10(j) of the ESA to the specific concerns raised in the

46

present litigation, and therefore Plaintiffs have not shown a substantial likelihood of prevailing on the merits of their Section 10(j) claim.

### D.   Other Equitable Factors

#### 1.   Irreparable Harm

In addition to a substantial likelihood of success on the merits, preliminary injunctive relief also requires a showing that a significant risk of irreparable harm will result if such relief is not granted.  See Greater Yellowstone Coalition, 321 F.3d at 1258.  In this case, Plaintiffs allege two kinds of irreparable harm:  (1) harm to the Mexican gray wolf species caused by hybridization, and (2) harm to Plaintiffs' social and economic interests caused by livestock depredation and other conflicts between wolves and human activities.

I conclude that Plaintiffs have not shown a significant risk of irreparable harm to the Mexican gray wolf species for essentially the same reasons that they have not shown a substantial likelihood of success on the merits of their ESA and NEPA claims concerning the issue of hybridization.  For purposes of considering whether Plaintiffs' have shown a significant risk of irreparable harm to the species, I note that there is substantial evidence in the Administrative Record to support Defendants' findings that the reintroduction and translocation of Mexican gray wolves in the recovery area will further the conservation of the species and that the potential for hybridization does not pose a significant risk to the species.  While under Plaintiffs' view of the evidence, it is conceivable that wolves and other canids could surmount all of the natural and man-made barriers to hybridization and produce a "hybrid swarm" at some point in the future, the risk that such a possibility presents is

47

speculative.  Therefore, this remote possibility does not provide grounds for preliminary injunctive relief.  See Greater Yellowstone Coalition, 321 F.3d at 1258.

The alleged harm to Plaintiffs' social and economic interests caused by livestock depredation and other conflicts between wolves and human activities presents a closer question.  Plaintiffs point out that ranching and certain other small businesses in the wolf recovery area often do not generate sufficient revenue to enable them to sustain the losses caused by livestock depredation and other negative impacts attributable to the reintroduced wolves, even if such losses are in the relatively low numbers calculated by Defendants.[5] Plaintiffs further point out that the compensation programs administered by Defendant-Intervenors do not cover all of these wolf-related losses, as evidenced by the Oakleaf article and acknowledged in the FEIS.  Thus, it is conceivable that, in combination with all the other factors to which ranching and other rural small businesses are subjected (e.g., market fluctuations, drought, flooding, disease, and predation by other animals such as coyotes, mountain lions, and bears), wolf-related losses could cause a significant number of ranchers to go out of business, which could change the nature of the economy in the region and, ultimately, result in harm to the environment as a result of such changes.

Although the somewhat precarious position of the rural economy in the wolf recovery area must be acknowledged and given appropriate weight, I conclude that Plaintiffs have not

---

[5]The FEIS acknowledges high rates of unemployment and poverty in the wolf recovery area, as well as a dependence on cattle ranching, particularly with respect to Catron County, New Mexico.  EIS AR 25, at 3-13.

shown that the harms which ranching and other rural businesses face is irreparable or is wholly attributable to the reintroduced wolves.  In this regard, the Oakleaf article relied upon by Plaintiffs acknowledges that most of the calves that were killed or went missing during that study were not eaten by wolves, and the detection rate for "nonpredation" calf deaths was even lower than the detection rate for calf deaths caused by wolves.  [Supp. AR 18, at s298 to s299 & tbl. 2.]

Further, Defendants and Defendant-Intervenors have in place several mitigation measures designed to reduce negative economic impacts caused by the wolf reintroduction program.  These measures include the compensation programs administered by Defendant-Intervenors as well as the Final Rule designating the reintroduced population of Mexican gray wolves as experimental and nonessential.  The effect of this designation is to give Defendants greater management flexibility, and this designation includes the authority harass, translocate, remove, or even kill reintroduced wolves that prey on livestock or create other significant conflicts with human activities.  While such mitigation measures are not perfect and do not entirely offset the damage to Plaintiffs' social and economic interests, they are sufficient to preclude a showing of the type of risk of irreparable harm necessary to warrant preliminary injunctive relief in this instance.

### 2.    Balance of Hardships and the Public Interest

The Supreme Court has held that the ESA "reveals a conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies." Tennessee Valley Auth. v. Hill, 437 U.S. 153, 184-185 (1978).   For these reasons, courts

have held that "[t]he 'language, history, and structure' of the ESA demonstrate Congress' determination that the balance of hardships and the public interest tips heavily in favor of protected species" when considering motions for preliminary injunctive relief. Nat'l Wildlife Fed'n v. Burlington Northern R.R., 23 F.3d 1508, 1511 (9th Cir.1994) (citing Tennessee Valley Auth., 437 U.S. at 174); Strahan v. Coxe, 127 F.3d 155, 171 (1st Cir.1997).

In this case, the balance of hardships and the public interest weigh in favor of allowing the reintroduction and translocation of Mexican gray wolves to proceed unhampered by the preliminary injunctive relief sought by Plaintiffs because such reintroduction and translocation efforts are likely to further the conservation of the species and thereby advance the congressional priorities set forth above.  While it is appropriate to consider the social and economic interests raised by Plaintiffs in the context of agency decision-making under NEPA and the ESA, in this instance the risk of harm to Plaintiffs' interests is outweighed by the risk of irreparable environmental harm to the Mexican gray wolf as a species that is likely to result if Defendants' reintroduction and translocation efforts were halted or scaled back by court action at this juncture.  I further determine that the issuance of the requested preliminary injunctive relief would be contrary to the public interest in light of the congressional intent expressed in the ESA.

## III.   CONCLUSION

For the foregoing reasons, I conclude that Plaintiffs have not met the stringent requirements for obtaining preliminary injunctive relief under the traditional equitable factors discussed above and the standard of review that this Court is required to apply under Section

50

706 of the APA.  As noted above, my analysis is limited to the issues raised in *Plaintiffs'*
*Motion for Preliminary Injunction* and is subject to reconsideration upon completion of
briefing on the merits and further review of the Administrative Record.

My conclusion that Plaintiffs have not met the stringent requirements for preliminary
injunctive relief does not mean that the public-policy concerns they have raised are invalid
or that their recommendations for improving the day-to-day management of the Mexican
gray wolf reintroduction program should be ignored.  In this regard, I acknowledge that
Plaintiffs have raised legitimate concerns about the social and economic hardships faced by
some ranchers and other small businesses in the wolf recovery area, as well as the need for
more awareness and resources directed at prevention and compensation programs relating
to livestock depredation.

My role in resolving such public-policy disputes is limited, however, by the Supreme
Court's recent admonition "to protect agencies from undue judicial interference with their
lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which
courts lack both the expertise and information to resolve."  Norton, 124 S. Ct. at 2381.  This
admonition does not weigh in favor of granting preliminary injunctive relief in this case.

**IT IS THEREFORE ORDERED** that *Plaintiffs' Motion for Preliminary Injunction*
[Doc. No. 26] is **DENIED.**

**IT IS FURTHER ORDERED** that *Plaintiff's Motion to Expedite Motion for*
*Preliminary Injunction* [Doc. No. 78] is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that *Plaintiff's Motion to File Surreply in Response to Defendants' Filing Notice of Supplemental Authority* [Doc. No. 89] is **GRANTED**.

**SO ORDERED** this 6th day of July, 2004, in Albuquerque, New Mexico.

_____
**M. CHRISTINA ARMIJO**
United States District Judge