## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**COALITION OF ARIZONA/NEW MEXICO
COUNTIES FOR STABLE ECONOMIC
GROWTH**, a non-profit organization, et al.,

        Plaintiffs,

        vs.                      No. **CIV 03-508 MCA/LCS**

**UNITED STATES FISH AND
WILDLIFE SERVICE**, et al.,

        Defendants,

    and

**DEFENDERS OF WILDLIFE**, et al.,

        Defendant-Intervenors.

### MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Plaintiffs' ***Opening Brief on the Merits*** [Doc. No. 82] filed on June 23, 2004, and ***Plaintiffs' Motion to Supplement the Administrative Record*** [Doc. No. 94] filed on August 2, 2004. Having considered the Administrative Record [Doc. No. 39, 46, 77], the parties' submissions, the applicable law, and being fully advised in the premises, I conclude that Plaintiffs' claims do not provide a basis for this Court to set aside or compel actions by Defendants under the Administrative Procedure Act (APA), the National Environmental Policy Act (NEPA), or the Endangered Species Act (ESA). Therefore, Plaintiffs' request to enjoin Defendants' efforts to reintroduce the Mexican gray wolf in the Blue Range Wolf Recovery Area (BRWRA) must be denied.

*Plaintiffs' Motion to Supplement the Administrative Record* [Doc. No. 94] is denied as moot.

## I.  <u>BACKGROUND</u>

The history of the Mexican gray wolf reintroduction program and the litigation concerning the wolf's reintroduction is set forth in the Court's *Memorandum Opinion and Order* [Doc. No. 91] filed on July 6, 2004, denying *Plaintiffs' Motion for Preliminary Injunction* [Doc. No. 26]. Since that *Memorandum Opinion and Order* was filed, the parties have completed briefing on the merits, and Plaintiffs have filed a *Motion to Supplement the Administrative Record* [Doc. No. 94].

Plaintiffs devote the majority of their *Opening Brief on the Merits* to their claim that Defendant United States Fish and Wildlife Service (USFWS) has violated a provision of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332, and its implementing regulations, 40 C.F.R. § 1509(c), by failing to prepare a Supplemental Environmental Impact Statement (SEIS) regarding the reintroduction program for the Mexican gray wolf. To support this claim, Plaintiffs argue that an Environmental Assessment (EA) [AR 103] issued on February 10, 2000, as well as a Finding of No Significant Impact (FONSI) [AR 124, 129] issued on March 17, 2000, are inadequate and do not account for significant new information regarding translocation of wolves, livestock depredation, and hybridization between wolves and other canine species.

Plaintiffs also challenge the results of informal intra-agency consultations regarding the Mexican gray wolf that were completed by Defendant USFWS on May 31, 1995, and November 3, 2003, pursuant to Section 7 of the Endangered Species Act (ESA), 16 U.S.C.

§ 1536. [AR 343a, EIS AR 993.]    Finally, Plaintiffs assert that Defendants have not complied with the ESA's mandate to "further the conservation of the species" as required by Section 10(j) of the ESA, 16 U.S.C. § 1539(j)(2)(A).  Defendants' findings pursuant to Section 10(j) are set forth in the <u>Final Rule:  Establishment of a Nonessential Experimental Population of the Mexican Gray Wolf in Arizona and New Mexico</u>, 63 Fed. Reg. 1,752 (Jan. 12, 1998) (to be codified at 50 C.F.R. § 17.84(k)) (hereinafter "<u>Final Rule</u>").

After the Court ruled on Plaintiffs' *Motion for Preliminary Injunction* and their *Opening Brief on the Merits* was filed, Plaintiffs filed a motion to supplement the Administrative Record with the following documents:  (1) internal correspondence between two employees of the United States Forest Service dated December 4, 2002; (2) a newspaper article dated July 12, 2004, entitled "Local News:  Conservationists protest the boundry rule"; (3) a public-records request dated July 16, 2004, from Plaintiffs' counsel to the Arizona State Department of Game and Fish; and (4) a document entitled "Mexican Wolf Reintroduction Project Monthly Update June 1 - 30, 2004."  [Ex. to Doc No. 94.]

Defendants deny that any of Plaintiffs' claims have merit or that the Administrative Record requires further supplementation.   They also challenge Plaintiffs' standing to bring this suit and assert that Plaintiffs' claims do not involve an "agency action" that is subject to judicial review under Section 706 of the Administrative Procedure Act (APA), 5 U.S.C. § 706.  Finally, Defendants raise the affirmative defense of *res judicata*, or claim preclusion, based on the results of prior litigation regarding the reintroduction of the Mexican gray wolf.

3

## II.     ANALYSIS

### A.     Preliminary Issues

Before proceeding to a discussion of the merits of Plaintiffs' claims under the APA, ESA, and NEPA, I address Defendants' assertions that some or all Plaintiffs do not have standing to bring this suit and that some or all of Plaintiffs' claims are barred by the doctrine of *res judicata*. My analysis of these preliminary issues is divided into three components. The first component concerns the jurisdictional requirements for standing under Article III of the United States Constitution. The second component concerns the limitations on judicial review under the APA and includes consideration of whether or to what extent Plaintiffs are challenging a "final agency action," or a failure to take such action, under the parameters set forth in Southern Utah Wilderness Alliance v. Norton, 124 S. Ct. 2373 (2004). The third component concerns the doctrine of *res judicata*.

#### 1.     Article III Standing

Defendants assert that Plaintiffs lack the standing required to establish a "case or controversy" under Article III of the United States Constitution. See generally McConnell v. Fed. Election Comm'n, 124 S. Ct. 619, 707 (2003); Colo. Envtl. Coalition v. Wenker, 353 F.3d 1221, 1234 (10th Cir. 2004) (per curiam). At this stage of the litigation, Plaintiffs can no longer rely solely on the allegations in their *Complaint* in order to establish standing. They must instead come forward with admissible evidence to support each element required to establish a "case or controversy" under Article III. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561-62 (1992).

There are additional requirements which must be satisfied when an organization seeks to assert claims on behalf of its members.  "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Friends of Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U.S. 167, 180-181 (2000).

Defendants assert that these requirements are not met in this case because some of the Plaintiffs have not shown that their members would otherwise have standing to sue in their own right.  To support this assertion, Defendants point out that not all of the Plaintiffs' organizations are represented in the nine signed declarations that Plaintiffs have submitted to establish their members' standing.  [Doc. No. 61, 65, 69, 70, 71.] Indeed, there are two declarations by individuals and/or couples who do not identify themselves as members of any of the Plaintiffs' organizations.  [Whetten Decl.; Fitch Decl.]

After reviewing each of the signed declarations, however, I find that there are four declarations by individuals who identify themselves as members of the New Mexico Cattle Growers Association (NMCGA). [Blair Decl. ¶ 3; Galley Decl. ¶ 3; Schneberger Decl. ¶ 3; Stacy Decl. ¶ 3.]  There are three declarations by individuals who identify themselves as members of the Gila Permittees Association or the Gila National Forest Permittees Association (GNFPA).  [Blair Decl. ¶ 3; Pyle Decl. ¶ 3; Schneberger Decl. ¶ 3.]  There are also three declarations by individuals and/or couples who identify themselves as members

of the Arizona Cattle Growers Association (ACGA).  [Ely Decl. ¶ 3; Fillemon Decl. ¶3; Stacy Decl. ¶ 3.]  Two declarations are submitted by members of the New Mexico Public Lands Council (NMPLC).  [Blair Aff. ¶ 3; Schneberger Aff. ¶ 3.]  Finally, there is one declaration by an individual who identifies himself as a member of the "New Mexico and Arizona Counties Coalition."  [Blair Decl. ¶ 3.]  I find it reasonable to construe this declarant's statement as a plain-spoken way of referring to the "Coalition of Arizona/New Mexico Counties for Stable Economic Growth" (Coalition).

I further find that the above declarations are sufficient to show the injury-in-fact, causation, and redressability that are necessary to satisfy the minimum constitutional requirements of Article III with respect to these declarants.  In this regard, I note that the above declarations show a geographical nexus to the site of Defendants' activities, see Comm. to Save the Rio Hondo v. Lucero, 102 F.3d 445, 449 (10th Cir. 1996), and it is possible that some of the declarants' alleged procedural injuries could be redressed by an injunction requiring preparation of an SEIS or additional consultation under Section 7 of the ESA, see Friends of Marolt Park v. United States Dep't of Transp., 382 F.3d 1088, 1095 (10th Cir. 2004); cf. Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 108 (1998) ("If respondent had alleged a continuing violation or the imminence of a future violation, the injunctive relief requested would remedy that alleged harm.").

On the other hand, I find that Plaintiffs have not submitted any signed declarations by individual members of the following organizations:  Grant County Farm and Livestock Bureau, Mimbres Farm and Livestock Bureau, New Mexico Farm and Livestock Bureau, and

New Mexico Wool Growers, Inc.  It follows that these organizations lack standing to appear as Plaintiffs in this matter because they have failed to show that any of their "members would otherwise have standing to sue in their own right."  Friends of Earth, Inc., 528 U.S. at 180.

Defendants also challenge Plaintiffs' standing on the grounds that the interests at stake in this litigation are not germane to the purpose of the Plaintiffs' organizations.  See id. at 180-81.  In response to this challenge, Plaintiffs have submitted the corporate bylaws of the following three organizations:  the Coalition; the NMCGA, and the GNFPA.  [Doc. No. 104, 105.]  These documents show that the Coalition has an open membership policy, and its purpose is "to enhance stable economic growth in the rural counties of Arizona and New Mexico."  [Ex. 1 to Doc No. 104.]  The NMCGA is open to persons engaged or interested in the livestock industry, and its purposes are:

> to advance and protect the cattle industry of New Mexico, work toward solutions of cattle industry problems, promote the well being of the industry, provide an official and united voice on issues of importance to the cattle producers and feeders, and to create and maintain an economic climate that will provide members of the Association the opportunity to obtain optimum return on their investments within the free enterprise system.

[Ex. 2 to Doc No. 104.]  The membership of the GNFPA is limited to "permittees of the Gila National Forest," and its purpose is to "protect the rights of permittees."  [Ex. 3, 4 to Doc No. 104.]

Defendants point out that the purposes of these organizations primarily relate to the economic interests of the livestock industry, and they have shown no interest in the protection or conservation of the Mexican gray wolf.  Indeed, the signed declarations

submitted by Plaintiffs assert that the presence of the reintroduced wolves in Arizona and New Mexico is having a negative impact on the interests of the declarants and the organizations to which they belong.  For this reason, Plaintiffs seek to have all of the reintroduced wolves destroyed or removed.

Nevertheless, I conclude that these three Plaintiffs (the Coalition, NMCGA, and GNFPA) have met their burden of showing that their interests and those of their members fall within the zone of interests protected by NEPA and Sections 7 and 10(j) of the ESA. The general requirements for standing to assert a NEPA claim in the Tenth Circuit are not onerous.  See Comm. to Save the Rio Hondo, 102 F.3d at 448-49; Sierra Club v. United States Dept. of Energy, 287 F.3d 1256, 1264 (10th Cir. 2002).  It is not necessary for Plaintiffs to assert a specific interest in the protection or conservation of the Mexican gray wolf in order to meet these requirements because NEPA calls for consideration of a broader range of environmental impacts, including some of those identified in the declarations submitted by Plaintiffs.  See Catron County Bd. of Comm'rs v. United States Fish and Wildlife Serv., 75 F.3d 1429, 1433 (10th Cir. 1996).

Similarly, the Supreme Court has broadened the zone of interests that can be used to establish standing to assert a claim under Section 7 of the ESA.  See Bennett v. Spear, 520 U.S. 154, 175-77 (1997) (interpreting 16 U.S.C. § 1536(a)(2)).  Based on their corporate bylaws and the declarations of their individual members, I find that Plaintiffs NMCGA, GNFPA, and the Coalition have made a sufficient showing that their interests fall within this zone.  While Bennett does not specifically address the zone of interests required for standing

8

under Section 10(j) of the ESA, I note that this provision of the statute contains similar language requiring the agency to make determinations "on the basis of the best available information." 16 U.S.C. § 1539(j)(2)(B).  Thus, the reasoning of <u>Bennett</u> also supports the standing of these three Plaintiffs (the Coalition, NMCGA, and GNFPA) with respect to their claim under Section 10(j) of the ESA.

I further note that the claims asserted against Defendants under Section 7 and Section 10(j) of the ESA do not arise under the ESA's "citizen suit" provision.  Rather, Sections 704 and 706 of the Administrative Procedures Act (APA) provide the mechanism for seeking judicial review regarding these claims.  <u>See</u> <u>Bennett</u>, 520 U.S. at 171-74; <u>Am. Rivers v. Nat'l Marine Fisheries Serv.</u>, 126 F.3d 1118, 1124-25 (9th Cir. 1997).  Therefore, Plaintiffs' alleged failure to comply with the sixty-day notice requirement of the ESA's citizen-suit provision does not preclude Plaintiffs' from litigating these ESA claims under Sections 704 and 706 of the APA.  In order to pursue their NEPA claim, Plaintiffs also must proceed under Sections 704 and 706 of the APA.

## 2.    <u>Limitations on Judicial Review Under the APA</u>

Since Plaintiffs' claims under NEPA and the ESA are subject to judicial review only by virtue of Sections 704 and 706 of the APA, it follows that Plaintiffs also must show that these claims fall within the parameters of judicial review set forth in the APA. The Supreme Court has recently limited the scope of agency activities which can be subject to such review, particularly with respect to an agency's compliance with NEPA.  <u>See</u> <u>Norton v. S. Utah Wilderness Alliance</u>, 124 S. Ct. 2373 (2004).  Plaintiffs, in turn, attempt to limit the scope

of the Supreme Court's holding in <u>Southern Utah Wilderness Alliance</u> by asserting that it only applies when a party seeks to "compel agency action unlawfully withheld or unreasonably delayed" under Section 706(1) of the APA.  5 U.S.C. § 706(1).

This assertion is incorrect.  The Supreme Court's conclusions with respect to the definition of "agency action" apply to the APA's scheme for judicial review as a whole and are not limited to actions under Section 706(1) of that statute.  In this regard, I note that the term "agency action" appears throughout the APA and is not limited to Section 706(1).  <u>See, e.g.</u>, 5 U.S.C. § 551 (defining "agency action" and the components of that definition); <u>id.</u> § 702 (providing a right of review of "agency action"); <u>id.</u> § 704 (providing for review of "final agency action"); <u>Id.</u> § 706(2) (providing the standard under which "agency action" may be held unlawful and set aside).

In <u>Southern Utah Wilderness Alliance</u>, 124 S. Ct. at 2379, the Supreme Court reasoned that the term "failure to act" is "properly understood as a failure to take an *agency action*--that is, a failure to take one of the agency actions (including their equivalents) earlier defined in § 551(13)" of the APA.  In other words, a "failure to act" means "that an agency has failed to take a *discrete* agency action that it is *required to take*."  <u>Id.</u>

It does not follow from this reasoning that Plaintiffs may challenge agency actions that are not discrete, or that the agency is not legally required to take, so long as they avoid characterizing such actions in terms of a "failure to act" or a withholding of action under Section 706(1) of the APA.  On the contrary, both Section 706(1) and Section 706(2) of the APA limit judicial review to agency actions that are discrete and legally required.

This point is emphasized in the discussion of <u>Lujan v. National Wildlife Federation</u>, 497 U.S. 871, 891 (1990), that appears in <u>Southern Utah Wilderness Alliance</u>, 124 S. Ct. at 2380.  <u>National Wildlife Federation</u> involved "a challenge to the BLM's land withdrawal review program, couched as unlawful agency 'action' that the plaintiffs wished to have 'set aside' under § 706(2)."  <u>Southern Utah Wilderness Alliance</u>, 124 S. Ct. at 2380 (quoting 5 U.S.C. § 706(2)).  Even though judicial review was sought under Section 706(2) rather than 706(1), the Supreme Court "concluded that the program was not an 'agency action,'" <u>id.</u> at 2380, because

> [t]he term "land withdrawal review program" . . . does not refer to a single BLM order or regulation, or even to a completed universe of particular BLM orders and regulations.  It is simply the name by which petitioners have occasionally referred to the continuing (and thus constantly changing) operations of the BLM in reviewing withdrawal revocation applications and the classifications of public lands and developing land use plans as required by FLPMA.  It is no more identifiable "agency action"--much less a "final agency action"--than a "weapons procurement program" of the Department of Defense or a "drug interdiction program" of the Drug Enforcement Administration.

<u>Nat'l Wildlife Fed'n</u>, 497 U.S. at 890.  "Except where Congress explicitly provides for our correction of the administrative process at a higher level of generality," federal courts "intervene in the administration of the laws only when, and to the extent that, a specific 'final agency action' has an actual or immediately threatened effect."  <u>Id.</u> at 894.

Both <u>Southern Utah Wilderness Alliance</u> and <u>National Wildlife Federation</u> express the same view--applicable to both Sections 706(1) and 706(2) of the APA--that the "principal purpose" of limiting judicial review to final, discrete, and legally required agency actions

11

"is to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." S. Utah Wilderness Alliance, 124 S. Ct. at 2381; accord Nat'l Wildlife Fed'n, 497 U.S. at 891-94. The APA does not provide federal courts with authority to enter "general orders compelling compliance with broad statutory mandates" or to inject themselves "into day-to-day agency management." S. Utah Wilderness Alliance, 124 S. Ct. at 2381. In other words, it is not the role of the courts to conduct a "general judicial review" of an agency's "day-to-day operations." Nat'l Wildlife Fed'n, 497 U.S. at 899.

These limitations on judicial review under the APA accord with the reasoning expressed by the Tenth Circuit in Gordon v. Norton, 322 F.3d 1213, 1219-22 (10th Cir. 2003), and Colo. Farm Bur. Fed'n v. United States Forest Serv., 220 F.3d 1171, 1173-74 (10th Cir. 2000). In Gordon, the Tenth Circuit reached the conclusion that a rancher's ESA claims relating to Defendant USFWS's regulation of Northern Rocky Mountain gray wolves reintroduced into northwestern Wyoming were not ripe for judicial review. The Tenth Circuit further concluded that the rancher's ESA claims did not involve "final agency action" because Defendant USFWS "was still in the decision-making process and was continuing to gather information on wolf activity and depredations." Gordon, 322 F.3d at 1220.

In Colorado Farm Bureau Federation, 220 F.3d at 1173, the Tenth Circuit concluded that the plaintiffs could not proceed with a claim under Section 706(2)(A) of the APA without meeting their "burden of identifying specific federal conduct and explaining how it is 'final agency action' within the meaning of Section 551(13)" of the APA. The plaintiffs

12

in that case failed to meet their burden with respect to the United States Forest Service's involvement with "the State of Colorado's 'Lynx Recovery Plan' . . . which proposed to reintroduce Canadian Lynx into Colorado." Id.

In this action, Defendants are engaged in activities relating to the Mexican gray wolf that do not qualify as "final agency actions" subject to judicial review under the APA at this juncture. For example, the Defendants are engaged in the ongoing, continuous process of implementing a recovery plan and a reintroduction program for the Mexican gray wolf. More generally, Defendants are under a broad statutory mandate to "conserve the species" as required under Section 10(j) of the ESA, and to insure that their actions are "not likely to jeopardize the species" under Section 7 of the ESA. Compliance with such broad statutory mandates, and the ongoing, day-to-day process of implementing recovery plans or reintroduction programs, are not the type of actions which can be subjected to judicial review under the limitations set forth in Southern Utah Wilderness Alliance and National Wildlife Federation.

There are, however, other actions that Defendants have taken in the course of implementing the above mandates and programs that are sufficiently discrete to qualify as "final agency actions" under the APA. For example, Defendants have issued the January 1998 Final Rule designating an experimental, nonessential population of Mexican gray wolves. See 63 Fed. Reg. at 1763 (to be codified at 50 C.F.R. § 17.84(k)). The Final Rule contains a finding that the designation of the reintroduced population of Mexican gray wolves as experimental and nonessential will "further the conservation of the species," as

13

required by Section 10(j) of the ESA.  Id.  Thus, to the extent that Plaintiffs claim under Section 10(j) of the ESA challenges this specific finding in the Final Rule, there exists a "final agency action" for purposes of judicial review under the APA.  See 5 U.S.C. § 551(13) (defining an agency action to include an "agency rule").

Defendants also have completed at least two intra-agency consultations pursuant to Section 7 of the ESA  [AR 343a, 993], and Plaintiffs contend that further Section 7 consultation is necessary.  The result of a consultation under Section 7 is discrete enough to qualify as an "agency action" subject to judicial review under Section 706(2) of the APA, and the failure to undertake a Section 7 consultation when legally required to do so may constitute a "failure to act" which can be compelled under Section 706(1) of the APA.  See Bennett, 520 U.S. at 177-78 (construing result of consultation under Section 7 of the ESA as "final agency action"); Am. Rivers, 126 F.3d at 1125 (same); cf. Sierra Club, 287 F.3d at 1263 (concluding that a "challenge to the failure of a federal agency to comply with the ESA's procedures" was ripe for judicial review at the time the alleged failure occurred).

I agree with Defendants that the "failure to consult" claim asserted in Plaintiffs' *Complaint* is now moot because Defendants in fact completed the requested consultation in November 2003, thus satisfying the procedural requirements of Section 7 of the ESA.  [AR 343a.]  See S. Utah Wilderness Alliance v. Smith, 110 F.3d 724, 729-30 (10th Cir. 1997); Am. Rivers, 126 F.3d at 1123-24.  Nevertheless, Plaintiffs may raise a substantive challenge to the result of that consultation under the standard set forth in Section 706(2) of the APA. The result of a consultation under Section 7 of the ESA is discrete enough to qualify as an

14

"agency action."  See Bennett, 520 U.S. at 177-78; Am. Rivers, 126 F.3d at 1125.

With respect to Plaintiffs' NEPA claims, I note that Defendants have issued a Record of Decision (ROD) and Statement of Findings regarding the "Environmental Impact Statement on Reintroduction of the Mexican Wolf to its Historic Range in the Southwestern United States" (EIS) [AR 25].  See 62 Fed. Reg. 15,915.  Defendants subsequently issued an EA and FONSI regarding translocation of reintroduced Mexican gray wolves to the secondary recovery zone.  [AR 103, 124, 127.]  These are discrete agency actions which can be challenged as "arbitrary and capricious" under Section 706(2) of the APA.  See generally Utah v. United States Dep't of Interior, 210 F.3d 1193, 1197 (10th Cir. 2000) ("[J]udicial review of final agency action under the Administrative Procedure Act, §5 U.S.C.  702, . . . provides the proper procedure to challenge the sufficiency of an EIS.").

Plaintiffs also allege a failure to prepare an SEIS pursuant to NEPA.  Insofar as the preparation of an SEIS constitutes a discrete agency action that Defendants are legally required to take, Plaintiffs may also seek judicial review of Defendants' alleged withholding of such action under Section 706(1) of the APA.  See generally Catron County Bd. of Comm'rs, 75 F.3d at 1434; cf. Sierra Club, 287 F.3d at 1263 ("[A] challenge to the failure of an agency to comply with the NEPA procedures becomes ripe at the time the failure takes place, assuming the plaintiff has standing to bring the claim.").

Defendants contend that they are not legally required to prepare an SEIS in this instance because, among other things, there is no ongoing "major Federal action" which could trigger such a legal requirement.  In order to resolve this contention, the term "major

Federal action," as it appears in NEPA, must be distinguished from the term "agency action" as it appears in the APA.

The ROD and EIS describe the "major federal action" at issue here in terms of a "Preferred Alternative" that encompasses several components, including issuance of the Final Rule designating an experimental, nonessential population of wolves, implementation of "management plans that allow dispersal by the new wolf populations from the immediate release areas," the "attempt to enter into cooperative management agreements with . . . landowners," and implementation of an "interagency cooperative management plan" with respect to "[p]ost-release management."   [AR 18?, at 11-12.]   In many respects, this "Preferred Alternative" resembles the type of broad, multi-faceted "land use withdrawal review program" that the Supreme Court found to be unreviewable in National Wildlife Federation, 497 U.S. at 890.  Thus, the broad program described in the Preferred Alternative may not qualify as an "agency action" under the APA, even though it is characterized under NEPA as a "major Federal action" requiring the preparation of an EIS and an ROD.

It is the EIS and ROD, rather than the Preferred Alternative described in those documents, that constitutes the "agency action" subject to judicial review under the APA. In other words, Plaintiffs are not requesting judicial review of the merits of the Preferred Alternative itself.  Rather, they seek to compel the preparation of an SEIS in order to obtain further study of the environmental impacts of the "major Federal action" identified in the "Preferred Alternative."  If legally required under NEPA, the SEIS itself would constitute "agency action" that could be compelled under Section 706(1) of the APA.

16

The dispositive question is whether the "major Federal action" identified as "the Preferred Alternative" is ongoing, such that preparation of an SEIS could be legally required under NEPA if there were significant new information or a substantial change in the program. Focusing on this narrower issue, there are some facets of the Preferred Alternative, such as the issuance of the <u>Final Rule</u> designating an experimental, nonessential population of wolves, which resemble the approval of the land use plan at issue in <u>Southern Utah Wilderness Alliance</u>, 124 S. Ct. at 2385. Upon its approval, that land use plan left no "ongoing 'major Federal action' that could require supplementation" absent an amendment or a revision. <u>Id.</u> In this case, Plaintiffs do not allege or petition for an amendment or revision of the <u>Final Rule</u>. If they did, such a petition would have to be addressed in the first instance by an agency within the Executive Branch, not this Court.[1] Thus, with respect to the <u>Final Rule</u>, the Court agrees with Defendants that there is no ongoing "major Federal action" which could trigger the legal requirement of an SEIS. This requirement cannot be invoked simply by providing an ongoing critique of Defendants' day-to-day operations.

On the other hand, the Preferred Alternative states an objective of reestablishing 100 wild wolves distributed over more than 5,000 square miles of the "recovery area." As defined by this objective, Defendants' actions could be analogized to the dam construction

---

[1]While the parties have alluded to the possibility of amending the <u>Final Rule</u> and noted the existence of an administrative procedure for doing so, the Administrative Record does not reflect that such possibilities and procedures have been invoked, much less that they have culminated in a discrete and final agency action which is subject to judicial review at this point. The Court cannot review agency actions based on the mere possibility that they might form the basis for such a rule change.

project at issue in <u>Marsh v. Oregon Natural Resources Council</u>, 490 U.S. 360, 370-74 (1989), which remains ongoing until its completion, *i.e.*, until Defendants meet the objective of 100 wild wolves in the recovery area by the year 2005.  According to the Administrative Record, Defendants have not yet met this objective and are still engaged in ongoing efforts to do so. Thus, while such efforts or objectives do not necessarily constitute "agency actions" subject to judicial review under the APA in and of themselves, they may nevertheless signal an ongoing "major Federal action," as that term is defined in NEPA and its implementing regulations, which could trigger the legal duty to prepare an SEIS if significant new information arose.  Issuance of such an SEIS constitutes "agency action" under the APA.

In the alternative, the EA and FONSI that were issued in the first quarter of 2000 concern a project-level implementation of a component of the Preferred Alternative that could trigger legal obligations under NEPA.  Under Section 706(2) of the APA, Plaintiffs may challenge the EA and FONSI as "arbitrary and capricious."   <u>See, e.g.</u>, <u>Greater Yellowstone Coalition v. Flowers</u>, 359 F.3d 1257, 1274 (10th Cir. 2004).  Thus, at least some portion of Plaintiffs' NEPA claim remains viable notwithstanding the limits on judicial review under the APA which are set forth in <u>National Wildlife Federation</u> and <u>Southern Utah Wilderness Alliance</u>.

### 3.    *Res Judicata* **or Claim Preclusion**

I next address Defendants' contention that Plaintiffs are precluded from litigating their NEPA and ESA claims in this action because those claims overlap with other claims that were (or could have been) brought in prior litigation.  <u>See</u> <u>New Mexico Cattle Growers Ass'n</u>

18

v. United States Fish and Wildlife Serv., CIV No. 98-367 M/JHG, Doc. No. 85, 86 (D.N.M.

Oct. 28, 1999).  Under the doctrine of *res judicata*, or claim preclusion, "a final judgment

on the merits of an action precludes the parties or their privies from relitigating issues that

were or could have been raised in the prior action."  Northern Natural Gas v. Grounds, 931

F.2d 678, 681 (10th Cir. 1991); accord Satsky v. Paramount Communications, Inc., 7 F.3d

1464, 1467 (10th Cir. 1993).

        As noted in the Court's prior *Memorandum Opinion and Order* [Doc. No. 91], there

was a previous action filed in this Court by some of the same organizations that are named

as Plaintiffs in this action.  That previous litigation also involved a challenge to the Mexican

Gray Wolf Reintroduction Program based on the requirements of the APA, NEPA, and the

ESA.  See New Mexico Cattle Growers Ass'n, CIV No. 98-367 M/JHG, supra.  Judge

Mechem entered a final judgment on the merits of the plaintiffs' claims in No. 98-367

M/JHG on October 28, 1999.  Therefore, Plaintiffs are precluded from litigating their claims

in the present action if Defendants can show that these same claims were or could have been

raised in the prior litigation and that Plaintiffs were parties to the prior litigation or in privity

with such parties.

        I conclude that Plaintiffs' challenge to the EA and FONSI regarding translocation of

wolves in the first quarter of 2000, as well as their challenge to the result of the informal

Section 7 consultation regarding translocation and hybridization issued in November 2003,

could not have been raised in the prior litigation.  Those actions had not yet occurred as of

the date of the final judgment entered on October 28, 1999. See generally Petromanagement

Corp. v. Acme-Thomas Joint Venture, 835 F.2d 1329, 1332 (10th Cir. 1988) (adopting the "transactional approach" to determining whether claims in present and prior litigation are the same or identical). For essentially the same reasons, the doctrine of *res judicata* does not bar Plaintiffs' from proceeding with the claim that an SEIS is necessary based on significant new information that did not exist at the time of the prior litigation.

On the other hand, there are several related claims that were or could have been raised in the prior litigation. These include any claims under Section 706(2) of the APA to set aside the Final Rule published in January 1998, the EIS issued in 1996, the ROD issued in 1997, and/or the prior consultation under Section 7 of the ESA that was completed in 1995. I do not understand Plaintiffs to be relitigating these earlier claims in the action presently before this Court, except to the extent that they continue to challenge Defendants' compliance with Section 10(j) of the ESA.

With respect to the latter claim, the "final agency action" necessary to invoke judicial review under the APA consists of the findings pursuant to 10(j) of the ESA that are contained in the Final Rule issued in January 1998. That Final Rule already was the subject of judicial review in the previous litigation. Thus, the issue of whether the doctrine of *res judicata* bars Plaintiff's present claim under Section 10(j) of the ESA (as well as any other challenges to the Final Rule, FEIS, ROD, or 1995 consultation) is likely to turn on whether the Plaintiffs who have standing in this action are in privity with the plaintiffs in the prior litigation.

Determining whether parties to present and prior litigation are in privity with one another can be a difficult task because "[t]he term 'privity' is now used to describe various

20

relationships between litigants that would not have come within the traditional definition of that term." Richards v. Jefferson County, 517 U.S. 793, 798 (1996) (citing Restatement (Second) of Judgments, supra, ch. 4); see also 18 James Wm. Moore *et al.*, Moore's Federal Practice § 131.40[3][a], at 131-135 (3d ed. 2004) ("[T]he concept of privity is an amorphous concept that is difficult to define."). At this stage of the litigation, however, this task is simplified to some extent by the Court's determination that only three of the Plaintiffs in this case have established standing under Article III of the United States Constitution. These three Plaintiffs are the Coalition, NMCGA, and GNFPA.

Plaintiff NMCGA was a party to the prior litigation before Judge Mechem and is therefore precluded from relitigating claims that were or could have been brought in that litigation. The Coalition and GNFPA were not parties in the prior litigation; however, I conclude that they were in privity with parties to that litigation for the following reasons.

First, I note that "concerns about the broad application of preclusion are lessened when the suit at issue raises claims based on public law rather than private rights." Headwaters, Inc. v. U.S. Forest Serv., 382 F.3d 1025, 1031 (9th Cir. 2004) (citing Richards, 517 U.S. at 803). "[T]he number of plaintiffs with standing is potentially limitless" in the public law context, and thus "[c]oncerns of judicial economy and cost to defendants . . . are particularly important in these cases." Id.

Further, I find that the interests of Plaintiffs NMCGA, GNFPA, and the Coalition are closely aligned if not virtually identical, as evidenced by their corporate by-laws and the declarations submitted by Plaintiffs in this case. All of these organizations are concerned

21

with the economic interests and property rights of the livestock industry and the permittees who hold livestock-grazing permits in the Gila National Forest.

In addition, the membership of these organizations overlaps to a significant degree, as evidenced by the declarations Plaintiffs have submitted in this case. The only declaration submitted by a member of the Coalition is the declaration of Mr. Blair. Mr. Blair states in his declaration, however, that he is a member of all three Plaintiff organizations at issue here: the Coalition, NMCGA, and GNFPA. Another one of the declarants, Ms. Schneberger, also states that she is a member of both the NMCGA and the GNFPA.

To allow Plaintiffs and those in privity with them to avoid the doctrine of *res judicata* in this broad, public-law context simply by reasserting the same claims over and over again under the banner of new or different organizations would be to countenance the type of endless litigation and manipulation of procedural rules that was criticized by the majority in Headwaters, Inc., 382 F.3d at 1031. Accordingly, I conclude that the doctrine of *res judicata* bars the three Plaintiff organizations which have established standing in this matter from reasserting claims that were or could have been raised in the prior litigation, namely their claim under Section 10(j) of the ESA, as well as any other challenges to the Final Rule, FEIS, ROD, or the 1995 consultation.

In the alternative, I also conclude that these Plaintiffs do not succeed on the merits of their claims regarding these prior actions, as indicated in the analysis below, as well as the analysis set forth by Judge Mechem in New Mexico Cattle Growers' Ass'n, CIV No. 98-367 M/JHG, supra. Even when doctrines of *res judicata* or *stare decisis* do not apply, courts are

22

by no means precluded from relying on prior court decisions as persuasive authority.  In this regard, the Supreme Court has acknowledged that:  "'The labor of judges would be increased almost to the breaking point if every past decision could be reopened in every case, and one could not lay one's own course of bricks on the secure foundation of the courses laid by others who have gone before him.'"  Hubbard v. United States, 514 U.S. 695, 711 (1995) (quoting B. Cardozo, The Nature of the Judicial Process 149 (1921)).  As previously discussed in the *Memorandum Opinion and Order* [Doc. No. 91] filed on July 6, 2004, I find Judge Mechem's *Memorandum Opinion and Order* in the prior litigation, as well as the Tenth Circuit's opinion in Wyoming Farm Bur. Fed'n v. Babbitt, 199 F.3d 1224 (10th Cir. 2000), to be persuasive authority with respect to issues that predated the present litigation, including Defendants' findings pursuant to Section 10(j) of the ESA as set forth in the Final Rule.

**B.      Standard of Review and Supplementation of the Administrative Record**

It follows from the foregoing analysis that some Plaintiffs and some claims are not properly before the Court at this juncture.  There are, however, three Plaintiffs who may proceed with the following claims:  (1) that NEPA and its implementing regulations require Defendants to prepare an SEIS based on significant new information that did not exist at the time of the prior litigation; (2) that the EA and FONSI issued in the first quarter of 2000 are legally insufficient to meet the requirements of NEPA; and (3) that the results of the informal consultation that Defendants completed in November 2003 are substantively inadequate under Section 7 of the ESA.

The standard for judicial review of each of these claims under the ESA and NEPA is provided by Section 706 of the APA, 5 U.S.C. § 706. <u>See</u> <u>Wyo. Farm Bureau Fed.</u>, 199 F.3d at 1231 (reviewing ESA and NEPA claims); <u>Friends of the Bow v. Thompson</u>, 124 F.3d 1210, 1214-15 (10th Cir. 1997) (similar).  The Tenth Circuit has stated that district courts are to conduct such review based on the Administrative Record and the Federal Rules of Appellate Procedure rather than convening a *de novo* trial and acting as an independent factfinder.  <u>See</u> <u>Olenhouse v. Commodity Credit Corp.</u>, 42 F.3d 1560, 1579-80 (10th Cir. 1994).

In this case, the Administrative Record designated by the Federal Defendants is extremely voluminous and is reproduced on three compact discs plus the summary report filed on April 12, 2004.  In addition, the parties have filed several motions concerning supplementation of the Administrative Record or consideration of materials outside the Administrative Record.  Indeed, Plaintiffs continued to submit such extra-record materials even after their opening brief on the merits was filed, thereby presenting an ongoing critique of Defendants' day-to-day activities as they occurred.

The Court has considered these extra-record materials for certain limited purposes such as establishing Plaintiffs' standing, applying traditional equitable principles used in deciding whether preliminary injunctive relief is warranted, and determining if these materials fall within any of the recognized exceptions to the general rule limiting judicial review to the Administrative Record designated by the agency.  Apart from these exceptions, however, the merits of Plaintiffs' claims must be decided based on the Administrative Record

designated by Defendant USFWS, without consideration of *post hoc* rationalizations by counsel.  See generally Bar MK Ranches v. Yeutter, 994 F.2d 735, 740 (10th Cir. 1993); Custer County Action Ass'n v. Garvey, 256 F.3d 1024, 1028 n.1 (10th Cir. 2001); Am. Mining Cong. v. Thomas, 772 F.2d 617, 626 (10th Cir.1985)); Commercial Drapery Contractors, Inc. v. United States, 133 F.3d 1, 7 (D.C. Cir. 1998).   Thus, the fact that the Court has examined the parties' extra-record materials for other, limited purposes does not necessarily mean that they are considered part of the Administrative Record, that Defendant USFWS erred in omitting them from the Administrative Record, or that counsel for Defendants may correct any errors disclosed in the Administrative Record through *post hoc* rationalizations.  See Am. Mining Cong., 772 F.2d at 626; Olenhouse, 42 F.3d at 1574-75.

In addition, the Court finds that Plaintiffs' *Motion to Supplement the Administrative Record* is now moot because even if these materials were considered under an exception to the general rule noted above, the Court's review of those materials would not change its ultimate conclusion that Section 706 of the APA provides no basis to set aside or compel Defendants' actions pursuant to NEPA or the ESA in this case.  These extra-record materials simply summarize ongoing agency activities that do not constitute "final agency actions" in and of themselves, and that do not constitute "significant new information" which would trigger the requirement of an SEIS or additional consultation under Section 7 of the ESA, when placed in the context of the Administrative Record as a whole.  Therefore, Plaintiffs' motion is denied as moot.

In addition to focusing judicial review on the Administrative Record, Section 706 of

the APA imposes limits on the Court's role as a fact-finder and restricts the types of relief the Court may award in this context.  In particular, Section 706 of the APA provides that courts shall set aside agency actions that are found to be "arbitrary and capricious."  See  5 U.S.C. § 706(2)(A); Marsh, 490 U.S. at 376; Friends of the Bow, 124 F.3d at 1218.  Under this standard, "the reviewing court 'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" Marsh, 490 U.S. at 378 (quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971)).  An agency acts arbitrarily and capriciously if it "entirely fails to consider an important aspect of the problem" or "offers an explanation for its decision that runs counter to the evidence before it or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  Motor Vehicle Mfrs. Ass'n v State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

Review of agency action under this standard requires a "searching and careful" inquiry.  Volpe, 401 U.S. at 416.  In particular,  "courts should not automatically defer to the agency's express reliance on an interest in finality without carefully reviewing the record and satisfying themselves that the agency has made a reasoned decision based on its evaluation of the significance--or lack of significance--of the new information."  Marsh, 490 U.S. at 378; accord Olenhouse, 42 F.3d at 1574-75; Sea Robin Pipeline Co. v. F.E.R.C., 127 F.3d 365, 370 (5th Cir. 1997); Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).

Deference to an agency's expertise is required, however, when resolution of the dispute "involves primarily issues of fact," such as whether the conclusions stated in an

existing environmental impact statement are inaccurate or incomplete in light of new information.  Marsh, 490 U.S. at 376-77.  "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."  Marsh, 490 U.S. at 378; accord Friends of the Bow, 124 F.3d at 1218; Holy Cross Wilderness Fund v. Madigan, 960 F.2d 1515, 1523-24 (10th Cir. 1992).  Such deference to agency expertise in resolving factual disputes accords with the Supreme Court's recent pronouncement that Section 706 of the APA is designed "to protect agencies from judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both the expertise and information to resolve."  S. Utah Wilderness Alliance, 124 S. Ct. at 2381.

If an agency action falls short of the standards set forth in Section 706 of the APA, Congress has imposed a mandatory duty on the reviewing court to order the applicable remedy provided therein, including injunctive relief to compel agency action unlawfully withheld or unreasonably delayed.  See Forest Guardians v. Babbitt, 174 F.3d 1178, 1187 (10th Cir. 1999).  Thus, in the context of judicial review under Section 706 of the APA, Plaintiffs' entitlement to injunctive relief rests on the merits of their claim that Defendants' actions are "arbitrary and capricious," "unlawfully withheld," or "unreasonably delayed."

### C.    Merits of Plaintiffs' NEPA Claim

Although the focus of Plaintiffs' NEPA claim has changed slightly since they presented their arguments in support of a preliminary injunction, the essence of this claim

27

remains the same:  Plaintiffs contend that Defendants have not fulfilled their obligations under NEPA and must cease the Mexican gray wolf reintroduction program and retrieve or destroy all wolves released pursuant to that program pending completion of a supplemental environmental impact statement (SEIS) under NEPA.  Defendants continue to deny this contention.  They assert that the Final Rule, EIS, ROD, EA, and FONSI have already adequately addressed the issues raised by Plaintiffs during the course of the briefing on the merits.

In order to analyze these claims, the Court must first distinguish an "environmental assessment" or "EA" from an "environmental impact statement" or EIS.  NEPA's implementing regulations define an "environmental impact statement" or "EIS" as a "detailed written statement as required by Section 102(2)(C) of the [National Environmental Policy] Act."  40 C.F.R. § 1508.11.  Section 102(2)(C) of NEPA, requires an EIS for "major federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  Although not expressly required by the statute itself, NEPA's implementing regulations also require the preparation of a supplemental environmental impact statement or "SEIS" "when '[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns,' [40 C.F.R.] § 1502.9(c)(1)(i), or when '[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.' Id. § 1502.9(c)(1)(ii)." Friends of the Bow, 124 F.3d at 1214; accord S. Utah Wilderness Alliance, 124 S. Ct. at 2384.

In order to determine whether an EIS is required, agencies typically prepare an

environmental assessment or "EA."  Agencies also may prepare an EA to determine whether an SEIS is required, although several courts have concluded that agencies may instead rely on "non-NEPA" documents other than an EA to make such determinations with respect to the need for an SEIS.  See Pennaco Energy, Inc. v. United States Dep't of the Interior, 377 F.3d 1147, 1151 (10th Cir. 2004) (collecting cases).

NEPA's implementing regulations define an "environmental assessment" as "a concise public document for which a Federal agency is responsible that serves to . . . [b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact."  40 C.F.R. § 1508.9(a)(1); see Friends of the Bow, 124 F.3d at 1214; Comm. to Preserve Boomer Lake Park v. Dept. of Transp., 4 F.3d 1543, 1554 n.9 (10th Cir. 1993).

Under NEPA's implementing regulations, "agencies may prepare an environmental assessment on any action at any time in order to assist agency planning and decisionmaking." 40 C.F.R. § 1501.3(b).  There are also circumstances in which agency regulations may require preparation of an EA, or in which no EA is required because the agency's action is categorically excluded from NEPA.  See id. §§ 1501.3(a), 1501.4(a).  In this case, the Court assumes for purposes of analysis that Defendants were legally required to prepare the EA which they did, in fact, prepare during the first quarter of 2000.  See id. § 1501.4(b).

Because the purpose of the EA is to assist the agency in determining whether to prepare a more detailed environmental impact statement in the first place, and not to serve as a substitute for such a detailed statement, the procedural requirements concerning the

29

EA's preparation are not as extensive as those which apply to the preparation of an EIS.  In this regard, NEPA's implementing regulations simply require that an EA "[s]hall include brief discussions of the need for the proposal, of alternatives as required by Section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted."  Id. § 1508.9(b); see Comm. to Preserve Boomer Lake Park, 4 F.3d at 1554 n.9.  In addition, the agency must "[p]repare a finding of no significant impact [FONSI] . . . if the agency determines on the basis of the environmental assessment not to prepare a statement," and the FONSI must be "made available to the affected public." Id. § 1501.4(e); see Friends of the Bow, 124 F.3d at 1214.  These requirements were satisfied in this case.

When, as here, an EIS already has been prepared for a particular program, the NEPA regulations allow and even encourage the agency to incorporate the conclusions of the EIS into subsequent EAs for smaller, project-level actions that fall within that program.  See Friends of the Bow, 124 F.3d at 1214 (citing 40 C.F.R. § 1502.20).  This procedure of linking an EA to a pre-existing EIS is called "tiering."  40 C.F.R. § 1502.20.  Under this tiering procedure, the subsequently prepared EA "shall concentrate on the issues specific to the subsequent action" and  "need only summarize the issues discussed in the broader [environmental impact] statement."  Id.; see also 40 C.F.R. § 1508.28.  Defendants complied with these regulations with respect to the tiering that they employed in preparing the EA and FONSI at issue in this case.

The Tenth Circuit has stated that:  "An agency's decision to issue a FONSI and not

prepare an EIS is a factual determination which implicates agency expertise and accordingly, is reviewed under the deferential arbitrary and capricious standard of review." Comm. to Preserve Boomer Lake Park, 4 F.3d at 1555; accord Greater Yellowstone Coalition, 359 F.3d at 1274. The same deferential standard of review applies to an agency's determination that an existing EA or EIS need not be supplemented before proceeding with a major federal action. In this context, challenging a FONSI and challenging the failure to prepare an SEIS both involve essentially the same factual question, *i.e.*, whether there exists new information that is "sufficient to show that the remaining action will 'affec[t] the quality of the human environment' in a significant manner or to a significant extent not already considered." Marsh, 490 U.S. at 374; accord S. Utah Wilderness Alliance, 124 S. Ct. at 2384; Friends of Marolt Park, 382 F.3d at 1096. The Court's role is to examine whether the agency has taken "a 'hard look' at the new information to assess whether supplementation might be necessary." S. Utah Wilderness Alliance, 124 S. Ct. at 2384.

In applying this standard, the Supreme Court has stated that "an agency need not supplement an EIS every time new information comes to light after the EIS is finalized. To require otherwise would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made." Marsh, 490 U.S. at 373; accord Friends of the Bow, 124 F.3d at 1218; Friends of Marolt Park, 382 F.3d at 1096. Further, once an agency action is completed, "[t]here is no ongoing 'major Federal action' that could require supplementation" of an EIS. S. Utah Wilderness Alliance, 124 S. Ct. at 2385.

Even when supplementation of an EIS is required, "it is well established that NEPA 'does not mandate particular results,' nor does it require agencies 'to elevate environmental concerns over other valid concerns.'" Lee v. United States Air Force, 354 F.3d 1229, 1237 (10th Cir. 2004) (quoting Utahns for Better Transp. v. U.S. Dep't of Transp., 305 F.3d 1152, 1162-63 (10th Cir.2002)) (citations omitted).  "Because NEPA imposes procedural rather than substantive requirements, '[t]he role of the courts in reviewing compliance with NEPA is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary and capricious.'" Id. (quoting Utahns for Better Transp., 305 F.3d at 1163).

In this case, Plaintiffs' claim that further supplementation of the FEIS and EA is necessary because of significant new information or changes with respect to the following issues:  (1) translocation of wolves from the Primary Recovery Zone to the Secondary Recovery Zone, (2) livestock depredation, and (3) hybridization between Mexican gray wolves and other species of canids.  In addition, Plaintiffs challenge the procedure under which the EA and FONSI were prepared in the first quarter of 2000.  I first address the procedural issues concerning the EA and FONSI.

## 1.    **Procedural Issues**

Plaintiffs contend that the procedure that Defendants used in preparing the EA and FONSI in the first quarter of 2000 was flawed because Defendants did not grant "cooperating agency" status to a county government, did not allow sufficient time for public comment, and did not adequately respond to comments from the public.  In this regard, they attempt to

analogize this case to other cases in which the agency's decision was found to be "rushed" or "prejudged" by a biased decision-maker. See Davis v. Mineta, 302 F.3d 1104, 1112 (10th Cir. 2002); Wyoming v. United States, 277 F. Supp. 2d 1197, 1220-21 (D. Wyo. 2003); Int'l Snowmobile Mfg. Ass'n v. Norton, 304 F. Supp. 2d 1278, 1291 (D. Wyo. 2004).

I do not find these authorities to be binding or persuasive in the context of this case. The agency action at issue here does not involve *pro forma* NEPA documents prepared in the first instance by a consultant who was contractually bound to obtain a fully approved FONSI by a certain date regardless of what the EA revealed or what comments were received from the public. Thus, the EA and FONSI at issue here do not suffer from the same defects identified in Davis, 312 F.3d at 1112-13.

While agencies should not prejudge the issues to be discussed in an EA, they may nevertheless limit their consideration to alternatives that are designed to substantially meet the general objectives of the proposed action, and these objectives may include some time constraints. See Colo. Envt'l Coalition v. Dombeck, 185 F.3d 1162, 1174-76 (10th Cir. 1999); Lee, 354 F.3d at 1238-39. In this case, the time constraints on the preparation of the EA and FONSI were reasonably related to the objectives of the proposed action and the tiering procedure set forth in NEPA's implementing regulations. They do not indicate bias or prejudgment.

With regard to the issue of "cooperating agency" status, the Court notes that the county allegedly denied this status is not named as a Plaintiff in this case, nor do the existing Plaintiffs provide admissible evidence necessary to establish their standing to litigate a claim

33

for "cooperating agency" status on behalf of a particular county.[2]  See Defenders of Wildlife,

504 U.S. at 561-62.  In this respect, the present case is distinguishable from Wyoming, 277

F. Supp. 2d at 1221, and Int'l Snowmobile Mfg. Ass'n, 304 F. Supp. 2d at 1291, where the

State of Wyoming was a plaintiff, and its "cooperating agency" status was in dispute.

Under NEPA's implementing regulations, designation of a "lead agency" and

"cooperating agencies" does not necessarily occur until a determination is made to prepare

an environmental impact statement.  See 40 C.F.R. § 1501.5.  Further, Defendants are not

legally required to grant "cooperating agency" status to counties under the NEPA regulations

even when a decision is made to prepare an EIS.  These regulations simply state that:  "An

agency *may* request the lead agency to designate it a cooperating agency," 40 C.F.R. §

1501.6, and a qualified "State or local agency . . . *may by agreement* with the lead agency

become a cooperating agency," 40 C.F.R. § 1508.5 (emphasis added).

Under the standard of review articulated in Southern Utah Wilderness Alliance, 124

S. Ct. at 2379, "the only agency action that can be compelled under the APA is action legally

*required*."  This "limitation to *required* agency action rules out judicial direction of even

discrete agency action that is not demanded by law." Id. at 2380.  It follows that neither the

APA nor NEPA's implementing regulations provide courts with the authority to compel

Defendants to designate a county as a "cooperating agency" or to set aside agency action

_____

[2]As noted above, the Coalition's standing in this matter rests on the signed declaration
submitted by Mr. Blair, who identifies himself as a member of the "New Mexico and Arizona
Counties Coalition."  [Blair Decl. ¶ 3.]  Plaintiffs have not submitted any signed declarations on
behalf of Catron County or any other county government.

based on a judge's independent finding that "cooperating agency" status is warranted.

Similarly, there is no legal requirement that the Defendants provide specific, individualized responses to public comments on an EA, or grant extensions of time for submitting such comments, in the manner requested here. The NEPA regulations regarding an agency's duty to respond to public comments apply to the preparation of an EIS, not an EA. Compare 40 C.F.R. § 1502.9(b) (stating required content of an EIS) with Id. § 1508.9 (stating required content of an EA); see Utah Envtl. Cong. v. Bosworth, 285 F. Supp. 2d 1257, 1271 (D. Utah 2003) (citing 40 C.F.R. § 1503.4(a)); cf. Jackson Hole Conservation Alliance v. Babbitt, 96 F. Supp. 2d 1288, 1298 (D. Wyo. 2000) (making further distinctions between an EA and an EIS).

The action in question here is an EA rather than an EIS.[3] Moreover, Plaintiffs do not assert that they are "applicants" with respect to this action under 40 C.F.R. § 1506.5(a), or that they were deprived of notice of the EA or FONSI pursuant to 40 C.F.R. § 1506.6. On the contrary, the Administrative Record shows that input from local governments and other entities was solicited prior to, during, and after the preparation of the EA. [AR 109, at 1-3.]

In a letter dated January 14, 2000, Defendants solicited comments from interested parties several weeks before the EA was issued. [AR 71.] Public comment on the EA was solicited for an additional thirty-day period in a letter dated February 10, 2000, which was

_____

[3]The Court notes that under the preceding analysis, the doctrine of *res judicata* bars Plaintiffs from relitigating claims pertaining to the EIS issued in 1996, and the Court understands Plaintiffs' procedural challenges to be aimed at the EA and FONSI issued in the first quarter of 2000.

accompanied by public notices and a press release.  [AR 103, 104, 106.]  The Defendants

held two public meetings on the EA at the beginning of March 2000.  [AR 109, 112, 113.]

The Defendants then issued the FONSI and accompanying NEPA documentation on March

17, 2000.  [AR 124, 127, 129.]

The FONSI and other documents in the Administrative Record indicate that

Defendants indexed the public comments they received, grouped them into issues or

categories, and provided at least a summary response in the FONSI itself.  [AR 124, 127,

129, 144.]  In particular, the FONSI and accompanying documentation sent to interested

parties noted that "many comments were outside the scope or decision making parameters

of the analysis in the EA."  [AR 124, 127, 129.]  The issue of cooperation with county

governments (particularly Catron County, New Mexico) was more specifically addressed in

an e-mail[4] [AR 115] and in the Defendants' earlier responses to public comments on the EIS

[EIS AR 25, at 5-68 to 5-71].

In the context of an EA, "'[a]n agency has a limited obligation to respond to public

comments,'" and this Court "is unwilling to invalidate the decision to approve the Project

based on a single allegedly unanswered request for information."  Utah Envtl. Cong., 285

F.3d at 1271-72 (quoting State of Cal. v. Block, 690 F.2d 753, 773 (9th Cir. 1982)).  This

---

[4]Plaintiffs' opening brief does not cite any portion of the Administrative Record other
than this e-mail [AR 115] as evidence that a county submitted a request for "cooperating agency"
status in the context of the EA.  The written comments of the Catron County Manager do not contain
such a request [AR 87], and in any event the county was given a role in the wolf reintroduction and
management process through its participation in the Interagency Management Advisory Group
(IMAG).  [EIS AR 1263.]

conclusion is underscored by the fact that the EA in question here was tiered to a prior EIS for which there was an extensive, multi-year process for public comment, and which was previously subject to judicial review in litigation brought by the Plaintiffs or those in privity with them.  Under these circumstances, it is not the Court's role to "fly speck" the agency's NEPA documentation or to set aside the agency's decisions based on a "hyper-technical reading of the regulations."  Colo. Envtl. Coalition, 185 F.3d at 1172.

Plaintiffs also allege for the first time in their reply brief that the procedure noted above violated Section 555(e) of the APA, which provides that:  "Prompt notice shall be given of the denial in whole or in part of a written application, petition, or other request of an interested person made in connection with any agency proceeding."  5 U.S.C. § 555(e). This claim is not asserted in Plaintiffs' *Complaint*, and issues raised for the first time in a reply brief are generally deemed waived, especially when, as here, the court proceeds under the Rules of Appellate Procedure.  See State Farm Fire & Casualty Co. v. Mhoon, 31 F.3d 979, 984 n. 7 (10th Cir.1994); Lyons v. Jefferson Bank & Trust, 994 F.2d 716, 724 (10th Cir.1993).

To the extent this Court is required to address Plaintiffs' claim under Section 555(e) of the APA, I conclude that this claim does not have merit.  I do not construe Section 555(e) of the APA as requiring a specific, individual response to a County's request in addition to the more general language contained in the FONSI and other NEPA documentation already provided in this context.  The Tenth Circuit has acknowledged "the need to consider the administrative record as a whole in considering whether § 555(e) has been satisfied in the

37

NEPA context" because "[a]gency decisions in the environmental context are made against a backdrop of extensive documentation due to the NEPA requirements," and "no circuit court has ever remanded a decision to an agency based on § 555(e) in the NEPA context." Friends of the Bow, 124 F.3d at 1220. In this case, the issue was previously addressed in the responses to comments on the EIS, and the FONSI and accompanying documentation prepared in the first quarter of 2000 indicated that no SEIS would be prepared. Thus, the need to designate a "lead agency" and "cooperating agencies" for purposes of preparing an SEIS never arose, and further comments regarding this issue were adequately addressed as being "outside the scope or decision making parameters of the analysis in the EA." [AR 124, 127, 129.]

Plaintiffs other challenges to the EA and FONSI raise substantive questions about the accuracy of the factual findings contained in these documents rather than procedural questions about the manner in which they were prepared. I next turn to the analysis of these substantive questions.

### 2.    Translocation

Plaintiffs' substantive challenges to the EA and FONSI primarily concern Defendants' decision to translocate wolves from the Primary Recovery Zone in Arizona to the Secondary Recovery Zone in New Mexico. As previously noted in the *Memorandum Opinion and Order* [Doc. No. 91] filed on July 6, 2004, this issue is not new. The consequences of the wolves' presence in the Secondary Recovery Zone following their reintroduction, and the authority of Defendant USFWS to translocate wolves into that area for various management

purposes, were already studied and subjected to public comment in the FEIS and/or the <u>Final Rule</u>.  Thus, "the failure to issue a supplemental EIS is not arbitrary or capricious because the relevant environmental impacts have already been considered." <u>Friends of Marolt Park</u>, 382 F.3d at 1097.

The main difference between the natural dispersal initially contemplated under the "Preferred Alternative" in the FEIS and the active translocation effort contemplated in the EA and FONSI prepared in the first quarter of 2000 is that the translocation effort allows greater control over the movement of the wolves and involves the use of holding pens at specific translocation sites as well as temporary restrictions on public access around those sites.  Plaintiffs do not allege any new information relevant to the use of the holding pens or temporary restrictions on public access.

Rather, they premise their argument on the belief that translocation serves as a way of concentrating "problem wolves" in certain portions of the Secondary Recovery Zone, and that such concentration of "problem wolves" is likely to lead to higher levels of livestock depredation and other conflicts.  Plaintiffs assert that such negative consequences of translocation to the Secondary Recovery Zone are going to occur (or have occurred) because of the lack of availability of other prey for the wolves, combined with the remote and rugged nature of the terrain in the Gila Wilderness, which allegedly makes monitoring and controlling the wolves in this location more difficult.  According to Plaintiffs, these concerns were not adequately addressed in the EA and FONSI and require an SEIS.

To support their assertions, Plaintiffs point to comments regarding native-prey

populations submitted by the New Mexico Department of Game and Fish (NMDGF), and subsequent data and extra-record evidence regarding livestock depredation by the translocated wolves. I first discuss the issue of native-prey populations and then turn to the issue of "problem wolves."

**a.**     **Native Prey Populations**

Plaintiffs have not shown that Defendants acted arbitrarily or capriciously in declining to prepare an SEIS regarding the translocation project based on new information regarding native-prey populations. As noted above, it was permissible under NEPA's implementing regulations for Defendants to "tier" the EA for this project with the EIS for the reintroduction program, which already studied the environmental impacts caused by the reintroduced wolves' presence in the Secondary Recovery Zone. The prey base for the wolves in the entire BRWRA (including both the Primary Recovery Zone and the Secondary Recovery Zone) was modeled and studied extensively in the EIS and the supporting documentation cited therein. [EIS AR 25, ch. 4, at 4-2 to 4-4; EIS AR 490 to 501.] This modeling acknowledged that native-prey population trends may vary significantly from year to year and accounted for a variety of different multi-year population trend scenarios, including declining trends in the populations of deer and elk. [EIS AR 497.] In addition, the issue of native-prey populations was specifically addressed in the prior litigation that Plaintiffs are now precluded from relitigating. See New Mexico Cattle Growers Ass'n, No. CIV 98-367, supra, Doc No. 85, at 36-37 (noting, for example, that "[w]olves are known ... to move easily from one type of prey to another" depending on their availability).

40

Thus, with respect to the EA and FONSI issued in the first quarter of 2000, the question presented is whether there is new information indicating that native-prey populations (namely deer and elk) have trended downward to such a significant degree that it is no longer reasonable for Defendants to rely on the modeling and studies prepared for the EIS--even though the prior modeling specifically accounted for such downward population trends and was previously affirmed on judicial review. This question is a factual one for which courts are required to defer to Defendants' expertise so long as it is supported by substantial evidence in the Administrative Record. See Marsh, 490 U.S. at 376-77; Comm. to Preserve Boomer Lake Park, 4 F.3d at 1555.

I determine that there is substantial evidence in the Administrative Record to support the FONSI's conclusion that the NMDGF's comments regarding native-prey populations "did not present new information or identify issues which would suggest the original analysis presented in the EIS was lacking or otherwise not accurate." [AR 124.] The Administrative Record reflects that NMDGF employees initially submitted comments on the EA which expressed concerns about the lack of an adequate wildlife prey base for the reintroduced or translocated wolves. [AR 100, 101.] These comments express the opinion that there is a declining trend in the population of deer, but acknowledge recent estimates that elk (rather than deer) constituted approximately 80% of the large, wild prey killed by the reintroduced wolves thus far. [AR 101.] Accordingly, the NMDGF also suggested that in selecting the translocation sites, Defendants should take into consideration whether each proposed site is occupied by a viable elk herd or intersects with the elk's seasonal migration patterns or other

known movements.  [AR 101.]

The concerns expressed in the NMDGF's initial comments regarding the adequacy of the prey base [AR 100, 101] appear to be based on the NMDGF's 1999 estimates [AR 39] later referenced on page 12 of the EA [AR 103].  Those 1999 estimates suggested that there was a significant declining trend in deer populations in the Gila Wilderness from 1992 to 1999, but that elk populations in the area remained stable during that time frame.  [AR 39.] With respect to the elk populations, the information submitted in 1999 indicated that NMDGF was attempting to reduce the number of elk in some areas by increasing the number of hunting permits issued each year for those areas.  [AR 39.]

On February 11, 2000, NMDGF sent an email message to Defendants with an updated set of estimates on native prey populations.  February 11, 2000, was the day after the EA was issued and thus constituted the first day of the thirty-day public comment period on the EA. The NMDGF's email message of February 11, 2000, suggested that the 1999 estimates predicting a declining trend in the deer population were not accurate, and that the actual numbers were more in line with the higher 1992 estimates.  [AR 105.]  This email message also notes the availability of other prey species and acknowledges the prior modeling conducted for the EIS, which is contained in the Administrative Record and referenced in the body of the EIS.  [EIS-AR 497, 498; AR 25, ch. 4, at 4-2 to 4-4.]  The FONSI was not issued until after receipt of the NMDGF's email message of February 11, 2000, containing the updated estimates which were more in line with the previous estimates that predated the EIS.  [AR 124, 127.]  Thus, the FONSI was not arbitrary or capricious in reasoning that the

42

earlier comments premised on the 1999 estimates "did not present new information or identify issues which would suggest the original analysis presented in the EIS was lacking or otherwise not accurate." [FONSI, at 6; AR 124, 127.]

In addition, the FONSI provides "[t]ranslocation area selection criteria" which are responsive to the previous comments received from the NMDGF on this issue. [AR 100, 101.] In this regard, the FONSI states that: "Translocation site selection will be determined in coordination with the Forest Service, state wildlife agency, and interagency wolf field team." [FONSI at 4; AR 124, 127.] The site selection criteria are organized around the objective of giving the wolves "the best opportunity for success (minimize potential for conflicts) upon release." [FONSI at 4; AR 124, 127.]

For these reasons, I conclude that the issue of native-prey populations was not an aspect of the problem that Defendants entirely failed to consider, and Defendants treatment of this issue in the EA and FONSI is not "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43. Native-prey populations were considered and found to be adequate in the EIS, in the NEPA documentation culminating in the EA and FONSI, and in a subsequent three-year review of the wolf reintroduction program. [AR 557.] Forcing Defendants to continually redraft the EA or to issue an SEIS in order to duplicate an explanation that is already provided elsewhere in the Administrative Record "'would render agency decision-making intractable'" under these circumstances. Friends of Marolt Park, 382 F.3d at 1096 (quoting Marsh, 490 U.S. at 374); cf. Pennaco Energy, Inc., 377 F.3d at 1151 (noting that agencies

are not necessarily required to rely on NEPA procedures in order to document their decision not to prepare an SEIS based on new information).  Such redrafting also would be contrary to NEPA's "tiering" regulations, which instruct federal agencies that an "environmental assessment need only summarize the issues discussed in the broader [environmental impact] statement and . . . shall concentrate on the issues specific to the subsequent action."  40 C.F.R. § 1502.20.  "Congress did not enact the National Environmental Policy Act to generate paperwork or impose rigid documentary specifications," Colo. Envtl. Coalition, 185 F.3d at 1173, particularly with respect to a tiered EA that the NEPA regulations describe as a "brief" and "concise" document, see 40 C.F.R. § 1508.9.

### b.  Translocation of "Problem Wolves"

I also conclude that the EA and FONSI contain an adequate discussion of the issue of translocating "problem wolves" to the Secondary Recovery Zone.  In addition to criticizing the discussion of this issue in the EA and FONSI, Plaintiffs claim that the behavior of certain "problem wolves" following their translocation constitutes significant new information that triggers the requirement of an SEIS under NEPA's implementing regulations.  They characterize this claim as a failure to consider the "cumulative impacts" of translocating "problem wolves."  See 40 C.F.R. §§ 1508.25(a).

NEPA's implementing regulations define "cumulative impact" as:

the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.  Cumulative impacts can result from individually minor but collectively significant actions taking place over a

44

period of time.

40 C.F.R. § 1508.7.  As applied to the translocation project in the first quarter of 2000, this definition can be construed as requiring Defendants to consider and disclose the environmental impacts of their entire effort to translocate wolves into the Secondary Recovery Zone in the foreseeable future, rather than confining their analysis to the translocation of a particular wolf or group of wolves during one calendar year.

Such "cumulative impacts" were considered in this case, as the scope of the FEIS, ROD, and Final Rule specifically covers Defendant's long-term objective of establishing a population of 100 reintroduced wolves in the wild, as well as the reasonably foreseeable environmental impacts of the reintroduced wolves' presence in the entire Secondary Recovery Zone.  The EA and FONSI issued in the first quarter of 2000 were appropriately "tiered" to the FEIS, and the environmental analysis contained therein was not limited to the translocation of a particular wolf or group of wolves in that year alone.  Rather, the Final Rule and the existing NEPA documentation consider and disclose a broad framework that covers not only the reintroduction or translocation of individual wolves, but also the procedure for managing their presence in the wild and their interactions with human activities during the foreseeable future.

Plaintiffs' argument to the contrary contains several false premises.  First, Plaintiffs are mistaken in their premise that the translocation project serves as a means of concentrating "problem wolves" in a smaller area.  According to the Administrative Record, the Secondary Recovery Zone to which the "problem wolves" may be relocated is actually larger than the

45

Primary Recovery Zone in which they were previously released. [AR 25, Fig. 1; Supp. AR 30 (noting addition of tribal lands to recovery area).] Thus, if none of the "problem wolves" were translocated to the Secondary Recovery Zone, then (absent natural dispersal) they would all remain concentrated in the smaller Primary Recovery Zone, thereby producing exactly the scenario about which Plaintiffs complain.

Defendants recognized this point in the EA and FONSI, where they reasoned that translocation provides a mechanism by which "problem wolves" can be dispersed to more suitable locations in the broader recovery area and given additional opportunity to change their behavior, rather than being concentrated in the Primary Recovery Zone where such opportunities are more limited. Defendants further predicted that such dispersal or translocation of "problem wolves" into the Gila Wilderness is less likely to cause a significant increase in livestock depredation, and more likely to further the goal of conservation of the species, because the Gila Wilderness contains "an extensive area without permitted livestock use" where wolves are less likely to cross paths with livestock or pets. [AR 103, 124, 129.]

Another false premise in Plaintiffs' argument is the notion that the translocation project, and the Final Rule it serves to implement, require the translocation of *all* "problem wolves" to a specific portion of the Secondary Recovery Zone in New Mexico, do not allow wolves to be translocated for any other purpose or to any other location, and make translocation the exclusive remedy for redressing livestock depredation by "problem wolves." This premise is incorrect for the following reasons.

46

First, both the Final Rule and the NEPA documentation prepared in the first quarter of 2000 allow wolves to be translocated to other locations in the BRWRA and for purposes other than redressing livestock depredation.  The "other management situations" that the translocation project is designed to resolve include retrieving wolves that have naturally dispersed into unauthorized areas outside of the BRWRA and "genetic management" to reduce the risk of hybridization (*e.g.*, replacement of lost mates and genetic testing of wolves recaptured for purposes of translocation).[5]  [AR 103, 124, 129.]  They may also include translocation of wolves that "need aid or veterinary care," "impact game populations in ways which may inhibit further wolf recovery," or "are necessary for authorized scientific, research, or management purposes."  Final Rule, 63 Fed. Reg. at 1764 (to be codified at 50 C.F.R. § 17.84(k)(3)(ix)).  The annual reports contained in the Administrative Record reflect that translocations have occurred for management purposes other than redressing livestock depredation, *e.g.*, to replace a lost mate and thereby stimulate population growth, or to place wolves back in the BRWRA after they have strayed outside its boundaries.  [Supp. AR 10, 29, 30.]  These reports also reflect that translocations have occurred in portions of the BRWRA other than the Gila Wilderness in New Mexico.  [Supp. AR 29, 30.]

Neither the 2000 translocation project or the Final Rule rely exclusively on

---

[5]In this regard, the Administrative Record provides substantial evidence that the translocation project serves to reduce the risk of hybridization by providing opportunities for replacement of lost mates and genetic testing of wolves captured during the translocation process. These cumulative impacts, which may benefit the species, also may be considered in the agency's decision-making.

translocation as the only remedy for livestock depredation. On the contrary, they both provide for a number of mitigation measures in the event that the reintroduced wolves prey on livestock or engage in other nuisance behavior. The annual reports in the Administrative Record reflect that Defendants have employed these mitigation measures in addition to, or in lieu of, translocation. For example, Defendants have employed "aversive conditioning" techniques as well as recapture and removal of wolves that persisted in problematic behavior following their translocation. [Supp. AR 10, 29, 30.] They also have ordered "lethal control actions" for certain wolves in lieu of translocating them to New Mexico. [Supp. AR 30, at s435; Ex. 4 to Doc. No. 94.]

Finally, Plaintiffs are mistaken in asserting that the translocation project or the Final Rule set forth a rigid requirement that *all* "problem wolves" must be translocated, such that Defendants are irretrievably committed to funneling all "problem wolves" to a particular portion of the Secondary Recovery Zone in New Mexico, and Plaintiffs are left with no further recourse in the event that these wolves continue to prey on livestock or present conflicts with other human activities. Cf. Pennaco Energy, Inc., 377 F.3d at 1159 (noting that the purpose of NEPA is to require agencies to consider and disclose environmental impacts before committing themselves *irretrievably* to a given course of action). The Final Rule and the NEPA documentation prepared in the first quarter of 2000 make no such irretrievable commitment. As evidenced by the reports cited above, the Final Rule and the management regime studied in the NEPA documentation set forth a framework that includes a significant degree of flexibility with respect to deciding whether a particular wolf is a good

48

candidate for translocation, selecting appropriate translocation sites throughout the BRWRA, and redressing day-to-day problems that arise subsequent to the wolves' translocation. Given this flexible framework for managing "problem wolves," Plaintiffs' specific complaints about the ongoing behavior of particular wolves following their translocation to the Secondary Recovery Zone would seem to present a situation like the one at issue in Gordon, 322 F.3d at 1220, where there was no "final agency action" for a court to review because Defendant USFWS "was still in the decision-making process and was continuing to gather information on wolf activity and depredations."

To the extent that Plaintiffs contend that there exists "new information" about the reintroduction program or the translocation project simply because they question whether Defendants are making the correct decision as to whether a particular wolf or group of wolves should be killed or returned to captivity at any given moment, I conclude that Plaintiffs are not challenging a "final agency action" or an "ongoing major Federal action" that is subject to judicial review under Southern Utah Wilderness Alliance, 124 S. Ct. at 2379-81, 2385. To require preparation of a detailed SEIS at every moment in response to such ongoing and frequently changing daily management activities would render the agency's decision-making process intractable to the point of absurdity.

The Final Rule and existing NEPA documentation already set forth the decision-making framework and the management options for resolving disputes about the behavior of individual wolves or wolf packs. The foreseeable environmental impacts of operating under that framework have been considered and disclosed as required by NEPA. Further,

the Administrative Record reflects that Defendants continue to utilize this framework in the ongoing process of choosing appropriate management options for particular wolves or wolf packs in response to their daily activities.  For these reasons, there is no basis for this Court to set aside the existing NEPA documentation with respect to Defendants' translocation project, or to compel the preparation of an SEIS regarding this project, under the standard of review set forth in Section 706 of the NEPA.

### 3. Depredation

The fact that the reintroduced wolves are likely to interact with livestock also does not present a new issue requiring the preparation of an SEIS.  This issue was extensively considered and disclosed in the FEIS; it was addressed again in the EA and FONSI.  Indeed, Plaintiffs acknowledge in their *Opening Brief on the Merits* that the actual instances of livestock depredation by reintroduced Mexican gray wolves that have been confirmed and reported by Defendants are roughly in accordance with the estimates provided in the FEIS and the EA.  [Doc. No. 82, at 44.]

Nevertheless, Plaintiffs contend that an SEIS is necessary because they believe the reintroduced Mexican gray wolves are causing damage to livestock at much greater levels than Defendants have previously estimated or acknowledged.  To support this contention, Plaintiffs cite extensively from a journal article published in 2003 (the Oakleaf article) which suggests that the number of confirmed depredations by Northern Rocky Mountain gray wolves on a grazing allotment in Idaho for which ranchers are receiving compensation is only about one-eighth of the actual depredations that are occurring on that particular

allotment.

The Oakleaf article is contained in the Administrative Record [Supp. AR 18] and was extensively discussed in the *Memorandum Opinion and Order* [Doc. No. 91] denying *Plaintiffs' Motion for Preliminary Injunction* [Doc. No. 26].  Having carefully considered the Administrative Record, as well as the briefing on the merits and *Plaintiffs' Motion to Supplement the Administrative Record*, I conclude that the agency has made a reasoned decision not to prepare an SEIS based on its evaluation of the significance--or lack of significance--of the  information contained in the Oakleaf article.

Plaintiffs also have submitted a number of extra-record materials containing anecdotal accounts of livestock depredation and other conflicts between the reintroduced wolves and human activities.  In essence, the extra-record evidence presented by Plaintiffs simply presents opinions that conflict to some extent with the opinions of Defendants' experts (as stated in the Administrative Record) on the question of how much damage to livestock in and around the BRWRA is caused (or will be caused) by reintroduced Mexican gray wolves, including those translocated to the Secondary Recovery Zone.  Plaintiffs urge the Court to resolve this conflict in their favor because the declarations and other extra-record evidence they have submitted reflect the opinions of individuals who have substantial experience in the ranching business, or are otherwise endorsed by livestock-industry groups.  According to Plaintiffs, the declarations they have submitted are more credible for this reason.

Under the standard of review articulated by the Tenth Circuit, however, it is not the Court's function to resolve conflicts in the evidence by making credibility determinations in

51

this manner.  See Pennaco Energy, Inc., 377 F.3d at 1159.  Rather, the Tenth Circuit has repeatedly held that "'agencies are entitled to rely on their own experts so long as their decisions are not arbitrary and capricious.'"  Custer County, 256 F.3d at 1036 (quoting Colo. Envtl. Coalition, 185 F.3d at 1173 n.12); accord Lee, 354 F.3d at 1242; Wyoming Farm Bur. Fed'n, 199 F.3d at 1241.  In this case, Plaintiffs' extra-record evidence only demonstrates that there exists a factual disagreement about the cause or extent of livestock depredation and other conflicts between wolves and human activities.  The treatment of this issue in the existing NEPA documentation is not "so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43.  Under these circumstances, the presence of such a difference in view or factual disagreement "is an insufficient basis for admitting extra-record evidence or for holding an EIS inadequate."  Lee, 354 F.3d at 1244.  "[T]he mere presence of contradictory evidence does not invalidate the Agencies' actions or decisions."  Wyoming Farm Bur. Fed'n, 199 F.3d at 1241; accord  Custer County, 256 F.3d at 1036; Colo. Envtl. Coalition, 185 F.3d at 1173 n.12; Lee, 354 F.3d at 1242.

After their motion for a preliminary injunction was denied, Plaintiffs moved to supplement the Administrative Record with additional extra-record evidence.  In particular, they submitted an internal memorandum of the United States Forest Service dated December 4, 2002.  [Ex. 1 to Doc No. 94.]  This memorandum concerns the management of livestock grazing allotments in the Clifton Ranger District in Arizona and is addressed to the Forest Supervisor of the Apache National Forest, which is also located in Arizona.  The

memorandum does not indicate that it was ever transmitted to the Defendants in this case or that any official of the United States Fish and Wildlife Service received it prior to the filing of Plaintiff's *Motion to Supplement the Administrative Record*.

In addition, the memorandum appears to discuss ongoing, day-to-day management activities similar to those addressed by the Tenth Circuit in <u>Gordon</u>,  322 F.3d at 1219-22. As in <u>Gordon</u>, it appears that the Forest Service memorandum of December 2, 2002, does not present a "final agency action" that is ripe for judicial review because Defendant USFWS "was still in the decision-making process and was continuing to gather information on wolf activity and depredations." <u>Id.</u> at 1220.  In this regard, the "Latest Note from the Field" dated July 22, 2004, and attached as Exhibit 4 to Plaintiffs' motion, indicates that "the USFWS issued a lethal take order on Saddle Pack AM574," which is a member of one of the wolf packs referenced in the Forest Service memorandum of December 2, 2002.  The remaining members of the "Francisco Pack" also mentioned in that memorandum were then located in New Mexico, not Arizona.  [Ex. 4 to Doc. No. 94.]

The second item of information identified in Plaintiff's *Motion to Supplement the Administrative Record* is a copy of an on-line newspaper article concerning a meeting of the "Mexican Wolf Adaptive Management Work Group" in Silver City, New Mexico.  [Ex. 2 to Doc. No. 94.]  While the APA does not necessarily preclude agencies of the Executive Branch from receiving and considering newspaper articles in their decision-making, <u>see</u> <u>Bennett v. Nat'l Transp. Safety Bd.</u>, 66 F.3d 1130, 1137 (10th Cir.1995) (quoting §5 U.S.C. 556(d)), the Federal Rules of Evidence generally apply when such items are offered for the

first time in court.  Cf. Fed. R. Evid. 1101(e) (making Federal Rules of Evidence applicable to "review of agency actions when the facts are subject to trial *de novo* under section 706(2)(F) of" the APA.  The newspaper article at issue here is not part of the Administrative Record considered by the agency.  Insofar as it constitutes extra-record evidence offered in court pursuant to the Federal Rules of Evidence, the article consists of inadmissible hearsay. See New England Mut. Life Ins. Co. v. Anderson, 888 F.2d 646, 650 (10th Cir. 1989).

In their motion, Plaintiffs stated their intent to retrieve original documents from the meeting reported in the newspaper through an Open Records Act request to the Arizona State Department of Game and Fish [Doc. No. 94, at 5, Ex. 3].  However, no such documents were forthcoming at the time Plaintiffs filed their *Notice of Completion of Briefing* [Doc. No. 106] on this motion.  Therefore, this aspect of Plaintiffs' motion is deemed abandoned.

To the extent that this Court is required to consider and address the merits of the Forest Service memorandum, newspaper article, and other extra-record materials that Plaintiffs submitted for the first time in this litigation, I conclude that these materials do not provide a basis for compelling or setting aside Defendants' actions regarding the reintroduction of the Mexican gray wolf.  Insofar as these documents concern a "final agency action" rather than ongoing, day-to-day management activities, the framework for resolving the issues discussed therein already was considered and disclosed in the FEIS and other NEPA documentation contained in the Administrative Record, as well as the prior litigation from 1999, see New Mexico Cattle Growers Ass'n, CIV. No. 98-367 M/JHG, supra, and this Court's prior *Memorandum Opinion and Order* [Doc. No. 91] dated July 6, 2004.

54

NEPA is a procedural statute; it does not prevent Defendants from taking actions that have adverse environmental impacts on Plaintiffs' interests so long as the impacts in question are adequately considered and disclosed in the NEPA documentation, such that the agency's decision is not arbitrary or capricious. See Lee, 354 F.3d at 1237. In this case, Defendants met these procedural requirements with respect to the issue of livestock depredation.

### 4.    Hybridization

Plaintiffs next assert that supplementation of the EIS and the EA is required under NEPA because of new information concerning hybridization between reintroduced wolves and other canids (such as dogs and coyotes). In support of this assertion, Plaintiffs point to a single documented instance in the Spring of 2002 in which a litter of wolf-dog hybrid pups was born to a female Mexican gray wolf that had been reintroduced into the recovery area by Defendant USFWS. Although Plaintiffs have sought leave to supplement the Administrative Record with numerous materials since that date, they have not identified any other documented instances of hybridization involving the reintroduced wolves in the BRWRA.

The issue of hybridization was already addressed in detail in the Court's prior *Memorandum Opinion and Order* [Doc. No. 91] filed on July 6, 2004. After carefully reviewing the Administrative Record, as well as the briefing on the merits and Plaintiffs' *Motion to Supplement the Administrative Record*, I again conclude that the agency has made a reasoned decision based on its evaluation of the significance--or lack of significance--of the new information regarding the litter of hybrid pups born in the Spring of 2002.

I recognize that the discovery of the litter of hybrid pups is undoubtedly new information, since no hybrid pups born to the reintroduced wolves had ever been documented prior to this discovery.  I conclude, however, that determining the significance of this information is a fact question subject to a deferential standard of judicial review.  See Marsh, 490 U.S. at 372-74; S. Utah Wilderness Alliance, 124 S. Ct. at 2384.  Applying this deferential standard, I further conclude that Defendants did not act arbitrarily or capriciously in finding that this new information regarding the issue of hybridization is not significant enough to require an SEIS.

As noted in the Court's prior *Memorandum Opinion and Order* [Doc. No. 91], the issue of hybridization was discussed in Appendix A of the FEIS, and that discussion is supported by scientific literature in the Administrative Record.  The discovery of the litter of hybrid pups in the Spring of 2002 is specifically addressed in the intra-agency consultation documents prepared pursuant to Section 7 of the ESA in November 2003, and again this discussion is supported by the scientific literature in the supplemental Administrative Record regarding that consultation.  [AR 343a, EIS AR 993.]  An agency is permitted to explain its reasons for not preparing an SEIS in a "non-NEPA document," Pennaco Energy Co., 377 F.3d at 1157,  and in this instance I conclude that the intra-agency consultation documents in the Administrative Record serve substantially the same purpose as the "supplemental information report" at issue in Marsh,  490 U.S. at 379-81, and Friends of the Bow, 124 F.3d at 1216, 1218-21.

The agency discussions contained in the Administrative Record present plausible

reasons why the single documented instance of a litter of wolf-dog hybrid pups does not change the earlier prediction that hybridization does not present a significant danger to the conservation of the species or cause other unforeseen environmental impacts.  The fact that it is biologically possible for wolves to breed with other canids (including dogs and coyotes) and produce a litter of hybrid pups was known and acknowledged in the EIS and supporting literature.  While Plaintiffs may disagree with the scientific literature on which Defendants rely to support their views concerning the significance of the litter of hybrid pups born in the Spring of 2002, the existence of such a factual dispute concerning a topic within Defendants' specialized area of expertise does not provide grounds for setting aside an agency's decision-making as "arbitrary and capricious" under the APA.  See Custer County, 256 F.3d at 1036; Lee, 354 F.3d at 1242; Wyoming Farm Bur. Fed'n, 199 F.3d at 1241.

Similarly, Plaintiffs' disagreement with Defendants' conclusions regarding the reliability of genetic testing of various wolf subspecies and hybrid animals does not provide grounds for requiring supplementation of the EIS or the EA in this instance.  Similar disagreements regarding the reliability of genetic testing or other methods used to determine if particular animals or subspecies are in fact hybrids were extensively reviewed in prior litigation and found not to provide a basis for setting aside wolf reintroduction actions.  See, e.g., Wyoming Farm Bur. Fed'n, 199 F.3d at 1240-41;  New Mexico Cattle Growers Ass'n, CIV No. 98-367 M/JHG, supra, at 38-39.  I find these prior opinions to be persuasive authority in this case.

For all of the above reasons, I conclude that Plaintiffs do not succeed on the merits

of their NEPA claim regarding the reintroduction and translocation of Mexican gray wolves. The Administrative Record adequately and explicitly supports Defendants' analysis regarding the issues of wolf hybridization, livestock depredation, and the translocation of wolves to the Secondary Recovery Zone. In particular, Defendants satisfied their obligations under NEPA by preparing the EIS, ROD, <u>Final Rule</u>, EA, and FONSI. The Administrative Record shows that the agency took a "hard look" at the effects of this action, as required by NEPA, before proceeding with the translocation project and the implementation of the "Preferred Alternative" identified in the EIS and ROD. <u>See</u> <u>Robertson v. Methow Valley Citizens Council</u>, 490 U.S. 332, 350 (1989).

### D.    **Plaintiffs' ESA Claims**

I next turn to Plaintiffs' claims under Sections 7 and 10(j) of the ESA. In the context of this case, these ESA claims are interrelated with Plaintiffs' NEPA claim because they rely on the same body of evidence and factual arguments. Plaintiffs' ESA claims also remain subject to the same deferential standard of review under Section 706 of the APA because they concern factual issues within the realm of agency expertise.

#### 1.    **Section 7 of the ESA**

The consultation procedures required under Section 7 of the ESA and its implementing regulations are set forth in detail in the Court's *Memorandum Opinion and Order* [Doc. No. 91] filed on July 6, 2004. Defendant USFWS complied with these consultation procedures with respect to the reintroduction program for the Mexican gray wolf on two occasions: once on May 31, 1995, and again on November 3, 2003. [AR 343a, EIS

AR 993.]  Plaintiffs' challenge to the consultation completed on May 31, 1995, is barred by the doctrine of *res judicata* under the analysis provided above, and Plaintiffs' claim that Defendants failed to engage in the requisite Section 7 consultation procedure following the discovery of the litter of hybrid pups is moot at this point.  See S. Utah Wilderness Alliance, 110 F.3d at 729-30; Am. Rivers, 126 F.3d at 1123-24.  Apart from the specific consultation procedures and findings required under Section 7 of the ESA and its implementing regulations, the APA does not provide this Court with the authority to conduct a general judicial review of whether all of Defendants' ongoing activities are in compliance with a broad statutory mandate to avoid jeopardizing threatened or endangered species.  See S. Utah Wilderness Alliance, 124 S. Ct. at 2381; Nat'l Wildlife Fed'n, 497 U.S. at 899.

The documents resulting from Defendants' Section 7 consultation in the Fall of 2003 contain findings to the effect that the reintroduction and translocation of the nonessential, experimental population of Mexican gray wolves is not likely to adversely affect the species. These findings are supported by the rationale that the hybridization event in the Spring of 2002 was an isolated incident and that any hybrid pups are unlikely to survive and breed in the wild in light of the natural barriers discussed in the scientific literature and the specific management procedures employed by Defendant USFWS, which include genetic testing of reintroduced wolves and the removal of any hybrid animals found to exist.  [AR 343a.]

In the prior consultation conducted in 1995, as well as the NEPA documentation associated with the Final Rule, the agency reasoned that if the reintroduction program were to succeed and result in a sustainable population of Mexican gray wolves inhabiting the

recovery area, then this development would be of great benefit to the conservation of the species, in accordance with the statutory objectives of the ESA. If, on the other hand, the reintroduction program did not succeed and all of the reintroduced wolves had to be killed or otherwise removed from the recovery area due to hybridization or other negative consequences, then the agency concluded that the species would not be jeopardized because of the ongoing existence of the captive-breeding program from which the population of reintroduced wolves was derived. [EIS AR 25, 993.]

The question presently before the Court is whether the specific findings resulting from Defendants' informal Section 7 consultation in November 2003 are arbitrary, capricious, or unsupported by substantial evidence in the record. Plaintiffs assert that Defendants' findings fall short of these standards because they believe the reintroduction of Mexican gray wolves into the recovery area is likely to adversely affect the species by destroying its genetic integrity through hybridization. They further assert that it is arbitrary and capricious for the agency to conclude that the reintroduction program is not likely to adversely affect the species in this manner. At a minimum, Plaintiffs assert that formal consultation under Section 7 is required to support such a determination.

To support this claim, Plaintiffs rely on essentially the same evidence and factual arguments they previously advanced in support of their NEPA claim. Having concluded that this evidence and argument does not provide a basis for compelling or setting aside agency action under Section 706 of the APA with respect to Plaintiffs' NEPA claim, I further conclude that Plaintiffs' claim under Section 7 of the ESA also fails under this standard.

60

Defendants' rationale and supporting evidence regarding their informal consultations under Section 7 are set forth with sufficient detail in the Administrative Record, and Plaintiffs' disagreement with the opinions of Defendants experts regarding the potential for hybridization does not provide a basis for setting aside these informal consultations or requiring a formal consultation at this time.  See Wyo. Farm Bureau Fed., 199 F.3d at 1231; Forest Guardians v. United States Forest Serv., No. CIV. 01-504 MCA/KBM, slip. op. at 12-13 (D.N.M. Mar. 31, 2004) (unpublished memorandum opinion and order affirming result of informal consultation under Section 7 of the ESA).

## 2.      Section 10(j) of the ESA

Plaintiffs' final contention is that Defendants acted arbitrarily and capriciously by finding that the designation of an experimental, nonessential population of Mexican gray wolves will "further the conservation of the species," as required by Section 10(j) of the ESA.  As previously noted, this designation, and the concomitant finding that it will further the conservation of the species, were made in the Final Rule issued in January 1998.  See 63 Fed. Reg. at 1763 (to be codified at 50 C.F.R. § 17.84(k)).  The Final Rule, in turn, was the subject of the prior litigation adjudicated before Judge Mechem.  See New Mexico Cattle Growers' Ass'n, No. CIV 98-367 M/JHG, supra.  Thus, Plaintiffs' current attempt to challenge Defendants' Section 10(j) findings, as set forth in the Final Rule, is barred by the doctrine of *res judicata* as explained in further detail in Section II(A)(3) of this *Memorandum Opinion and Order*.

To the extent that the doctrine of *res judicata* does not apply, I conclude in the

alternative that Plaintiffs do not succeed on the merits of their Section 10(j) claim. Plaintiffs' current Section 10(j) claim is a variation of those previously adjudicated in Defendants' favor in New Mexico Cattle Growers' Ass'n, No. CIV 98-367 M/JHG, supra, and Wyoming Farm Bur. Fed'n, 199 F.3d at 1233-39. I find the opinions issued in those cases to be persuasive with respect to applying Section 10(j) of the ESA to the specific concerns raised in the present litigation. I also note that the evidence and factual arguments submitted in support of Plaintiffs' Section 10(j) claim were previously addressed in the context of Plaintiffs' NEPA claim and Section 7 claim. My review of that evidence and those factual arguments need not be repeated here.

To the extent that Plaintiffs raise a more generic challenge under Section 10(j) of the ESA that is not tied to the specific findings set forth in the Final Rule, I conclude that this challenge does not concern a "final agency action" that is subject to judicial review under Section 706 of the APA. Under the interpretation of the statute set forth in Southern Utah Wilderness Alliance, 124 S. Ct. at 2381, the APA simply does not provide courts with the authority or the requisite standards to conduct a general review of an agency's ongoing, day-to-day compliance with a broad, open-ended statutory mandate to "further the conservation of the species."

### E.  Request for Injunctive Relief

With respect to any equitable factors relevant to Plaintiffs' prayer for injunctive relief in this case, I hereby adopt the analysis set forth in the prior *Memorandum Opinion and Order* [Doc. No. 91] denying *Plaintiffs' Motion for Preliminary Injunction* [Doc. No. 26],

except as follows.  The standard required for *permanent* injunctive relief differs significantly from the standard for *preliminary* injunctive relief because the former remedy requires *actual* success on the merits rather than a mere *likelihood* of success.  See Fisher v. Okla. Health Care Auth., 335 F.3d 1175, 1180 (10th Cir. 2003).  Under the analysis provided above, Plaintiffs do not succeed on the merits of any of their claims in this litigation because Section 706 of the APA does not provide any basis for this Court to set aside or compel agency action under these circumstances.  Thus, I conclude that Plaintiffs are not entitled to injunctive relief in this case, notwithstanding any equitable factors that may weigh in their favor.

## III.   **CONCLUSION**

For the foregoing reasons, I conclude that Plaintiffs' claims in this litigation do not provide a basis for this Court to set aside or compel agency action under the standard of review provided in Section 706 of the APA.  My conclusion that Plaintiffs do not succeed on the merits of their claims under this standard precludes me from granting any injunctive relief in this case.

The limitations on judicial review imposed by Section 706 of the APA also preclude me from making any independent findings as to the overall success or failure of the Mexican Gray Wolf Reintroduction Program or the merits of the broader public-policy issues concerning this program that Plaintiffs have raised in their briefs and supporting documentation.  My role in resolving such issues is limited by the Supreme Court's recent admonition "to protect agencies from undue judicial interference with their lawful discretion,

and to avoid judicial entanglement in abstract policy disagreements which courts lack both the expertise and information to resolve." S. Utah Wilderness Alliance, 124 S. Ct. at 2381. Nevertheless, I remind the parties that this admonition is directed at the Judicial Branch and does not preclude private organizations and decision-makers in other branches of Government, including the Defendants and Defendant-Intervenors in this case, from giving due consideration to the recommendations Plaintiffs have made for improving the day-to-day management of this wolf reintroduction program, including the need for more awareness and resources directed at prevention and compensation programs relating to livestock depredation as it affects ranchers and other small businesses in the wolf recovery area.

**IT IS THEREFORE ORDERED** that the final agency action challenged in *Plaintiffs' Opening Brief on the Merits* [Doc. No. 82] is **AFFIRMED**, and all claims asserted in Plaintiffs' *Complaint* [Doc. No. 1] are **DISMISSED**.

**IT IS FURTHER ORDERED** that *Plaintiffs' Motion to Supplement the Administrative Record* [Doc. No. 94] is **DENIED AS MOOT.**

**IT IS FURTHER ORDERED** that this action is **DISMISSED WITH PREJUDICE**.

**SO ORDERED** this 31st day of January, 2005, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge